## TAYLOR AND MARSHALL *v.* BECKHAM (NO. 1).

ERROR TO THE COURT OF APPEALS OF THE STATF OF KENTUCKY.

No. 603.   Argued April 30, May 1, 1900. — Decided May 21, 1900.

By the constitution and laws of Kentucky, the determination of contests of the election of Governor and Lieutenant Governor is, and for a hundred years has been, committed to the General Assembly of that Commonwealth.

The Court of Appeals of Kentucky decided that the courts had no power to go behind the determination of the General Assembly in such a contest, duly recorded in the journals thereof; that the office of Governor or of Lieutenant Governor was not property in itself; and, moreover, that, under the constitution and laws of Kentucky, such determination being an authorized mode of ascertaining the result of an election for Governor and Lieutenant Governor, the persons declared elected to those offices on the face of the returns by the Board of Canvassers, only provisionally occupied them because subject to the final determination of the General Assembly on contests duly initiated.  *Held :*

(1) That the judgment of the Court of Appeals to the effect that it was not empowered to revise the determination by the General Assembly adverse to plaintiffs in error in the matter of election to these offices was not a decision against a title, right, privilege or immunity secured by the Constitution of the United States; and plaintiffs in error could not invoke jurisdiction because of deprivation, under the circumstances, of property or vested rights, without due process of law;

(2) That the guarantee by the Federal Constitution to each of the States of a republican form of government was intrusted for its enforcement to the political department, and could not be availed of, in connection with the Fourteenth Amendment, to give this court jurisdiction to revise the judgment of the highest court of the State that it could not review the determination of a contested election of Governor and Lieutenant Governor by the tribunal to which that determination was exclusively committed by the state constitution and laws, on the ground of deprivation of rights secured by the Constitution of the United States.

THIS was an action in the nature of *quo warranto* brought, under the statutes of Kentucky, by J. C. W. Beckham against William S. Taylor and John Marshall, for usurpation of the offices of Governor and Lieutenant Governor of Kentucky, in the Circuit Court of Jefferson County, in that Commonwealth.

The petition averred that at a general election held on the 7th of November, 1899, in the Commonwealth of Kentucky, William Goebel was the Democratic candidate for Governor and J. C. W. Beckham was the Democratic candidate for Lieutenant Governor, and that at said election William S. Taylor and John Marshall were the Republican candidates for the said offices respectively; that after said election the State Board of Election Commissioners, whose duty it was to canvass the returns thereof, canvassed the same, and determined on the face of the returns that said Taylor and said Marshall were elected Governor and Lieutenant Governor, respectively, for the term commencing December 12, 1899, and accordingly awarded them certificates to that effect, whereupon they were inducted into those offices.

The petition further alleged that within the time allowed by law said William Goebel and J. C. W. Beckham gave written notices to Taylor and Marshall that they would each contest the said election on numerous grounds set out at large in the respective notices; that said notices of contest were duly served on said Taylor and Marshall, filed before each house of the General Assembly, and entered at large on the journals thereof; that thereafter Boards of Contests were duly selected by each House of the General Assembly, and sworn to try said contests as required by law; that at the time appointed for

the hearing the said Taylor and Marshall appeared, and each filed defences and counter notices, and the evidence of contestants and contestees was heard by the Boards from January 15, 1900, until January 29, 1900, inclusive, and upon January 30, 1900, said contests were submitted without argument to the Boards for decision.

That thereafter the Boards, having considered the matters of law and fact involved in the contests, did each separately decide the contest submitted to it, and made out in writing its decision and reported the same to each House of the General Assembly for action thereon.

That in the contest for Governor the Board determined, and so reported to each House of the General Assembly, that William Goebel had received the highest number of legal votes cast for Governor at the election held on November 7, 1899, and that he was duly elected Governor for the term beginning December 12, 1899; and that in the contest for Lieutenant Governor the Board determined and so reported that the contestant Beckham had received the highest number of legal votes cast at said election, and was duly elected to the office of Lieutenant Governor for said term.

The petition also alleged that the reports and decisions of the Contest Boards were thereafter duly adopted and approved by both Houses of the General Assembly in separate and in joint sessions; that there were present in the House of Representatives at said time 56 members and in the Senate 19 members, which was a quorum of each House, and that there were present 75 members in joint session, and that the General Assembly did then and there decide and declare that William Goebel and J. C. W. Beckham had each received the highest number of legal votes cast at said election for the offices of, and were duly elected, Governor and Lieutenant Governor as aforesaid. The Journals of both Houses of the General Assembly, showing the proceedings and facts aforesaid, were referred to and made part of the petition, and attested copies thereof filed therewith.

It was further averred that after the determination of said contest by the General Assembly, the said William Goebel and

J. C. W. Beckham were duly sworn and inducted into the offices of Governor and Lieutenant Governor of the Commonwealth and at once entered upon the discharge of their respective duties. That thereafter, on the third of February, 1900, William Goebel died, and by law said Beckham was required to discharge the duties of the office of Governor, and accordingly on that day he took the oath prescribed by law, and immediately entered on the discharge of the duties of said office.

It was further alleged that the powers of Taylor as Governor and of Marshall as Lieutenant Governor immediately ceased on the determination of the contest by the General Assembly, but that notwithstanding the premises the said Taylor and Marshall had usurped the said offices of Governor and Lieutenant Governor, and refused to surrender the records, archives, journals and papers pertaining to the office of Governor, and the possession of the executive offices in the Capitol in the city of Frankfort.

The prayer of the petition was " that the defendant, William S. Taylor, be adjudged to have usurped the office of Governor of this Commonwealth, and that he be deprived thereof by the judgment of this court; that this plaintiff be adjudged entitled to the said office and be placed in full possession of said office of Governor, the executive offices provided by the Commonwealth for the use of the Governor, and that all the records, archives, books, papers, journals and all other things pertaining to the said office be surrendered and delivered to this plaintiff, by the said Taylor, and that the said Taylor be enjoined and restrained from further exercising or attempting to exercise the office of Governor of this Commonwealth; that the said John Marshall be adjudged to have usurped the office of Lieutenant Governor of the Commonwealth, and that he be deprived thereof, and declared not entitled to the same by the judgment of this court, and enjoined from assuming to act as such Lieutenant Governor; that plaintiff, Beckham, be adjudged the lawful incumbent of said office; and finally the plaintiff prays for his costs in this behalf expended, and for all proper relief."

Defendants Taylor and Marshall filed answers and amended

answers and counterclaims, denying any valid proceedings in contest, and alleging in substance that the action of the Boards of Contests and of the General Assembly in the contests was the result of a conspiracy entered into by the members of the Boards and the members of the General Assembly to wrongfully and unlawfully deprive contestees of their offices; that in the execution of this design the members of said Boards were fraudulently selected, and not fairly drawn by lot, as required by law, and that a majority of those selected were persons whose political beliefs and feelings, inclinations and desires on the subject of the contests were known in advance. That the entries on the Journals of the General Assembly were false and fraudulent, and made in pursuance of said conspiracy, and that the pretended decisions were fraudulent and utterly void. That the Senate lacked a quorum at the time of the pretended adoption of the Contest Boards' reports; and that defendant, Taylor, as Governor, on January 31, 1900, refused to permit the members of the General Assembly to meet as the General Assembly at Frankfort, because he had previously adjourned the General Assembly to meet on February 6 at London, in Laurel County.

The notices of contest were averred to have been exactly alike, *mutatis mutandis*, and the notice in respect of the office of Governor was set out as given in the margin.[1]

---

[1] "The Contestee, William S. Taylor, is hereby notified that the Contestant, William Goebel, who was more than thirty years of age, and has been a citizen and resident of Kentucky for more than six years, next preceding the 7th day of November, 1899, will contest the election of the said William S. Taylor to the office of Governor of this Commonwealth, before the next General Assembly thereof, to be convened as provided by law, in the city of Frankfort, on the 2d day of January, 1900, and before the Board of Contest to be organized by the said General Assembly for the purpose of determining the contest for Governor; and will then and there contest the right of the said William S. Taylor to the office of Governor of this Commonwealth by virtue of the election held therein on the 7th day of November, 1899, and the certificate of election granted unto the said William S. Taylor by the State Board of Election Commissioners on the 9th day of December, 1899; and will ask the General Assembly and said Board of Contest to determine that the Contestant, William Goebel, was legally and rightfully elected Governor aforesaid, at the said election, and that Wil-

The following are paragraphs from the answers and amended answers :

liam S. Taylor was not rightfully or legally elected to said office; and said Contestant will then and there ask the said Board of Contest and the General Assembly to take such proceedings and orders in the matters of said contest as is required by law for his induction into said office.

For grounds of such contest, the Contestant says:

First. In the election held in this Commonwealth on the 7th day of November, 1889, for the office of Governor, the Contestant, William Goebel, was the Democratic candidate, and the Contestee, William S. Taylor, was the Republican candidate for said office of Governor, and were then and there voted for as such candidates; and at said election held in the counties of Knox, Jackson, Magoffin, Pike, Martin, Johnson, Owsley, Lewis, Carter, Pulaski, Bell, Clinton, Russell, Adair, Harlan, Casey, Wayne, Whitley, Todd, Caldwell, Crittendon, Perry, Muhlenburg, Monroe, Metcalf, Butler, Letcher, Leslie, Lee, Laurel, Hart, Greenup, Grayson, Estill, Edmonson, Cumberland, Clay, Breckenridge, Boyd and Allen, and in each precinct thereof, all of the official ballots used, in all of said counties, were printed upon paper so thin and transparent that the printing and the stencil marks thereon, made by the voters, could be distinguished from the back of said ballots; that none of the said ballots used in said counties, were printed upon plain white paper, sufficiently thick to prevent the printing from being distinguished from the back of the said ballots, whereby the secrecy of the said ballots were destroyed, and the said election in all of the said counties rendered void, and the printed vote thereon should not be counted in ascertaining the result of the election in this Commonwealth.

Second. That the said alleged election held in the County of Jefferson and the City of Louisville on the 7th day of November, 1889, was and is void, because the Contestant says that upon that day before the said election, the Governor of the Commonwealth unlawfully called the military forces of the State into active service in said City, armed with rifles, bayonets and gatling guns, for the purposes of overawing, intimidating and keeping Democratic voters from the polls thereof, and did himself, in violation of the law of the land, go to the said City and County the day before said election and assume direction and command of the said military forces and ordered and directed them to go, and they did go, in obedience to said order, to the polling places in said city, on the said day of said election, and thereby many thousand of voters, to wit, more than enough to have changed the result of the said election, were intimidated and alarmed, and failed and refused to go to the polls or to vote on said day; that for this cause the said election in the City of Louisville and County of Jefferson, was not free and equal, but is void, and the said alleged votes cast thereat should not be counted.

Third. The Contestant says that on the day of the said election in the city of Louisville, and County of Jefferson, Sterling B. Toney, one of the

" Further answering herein defendants, W. S. Taylor and John Marshall, say, each of them is over forty years of age,

---

circuit judges of the County and City aforesaid, without authority of law, issued a mandatory injunction, by which he required the legally appointed officers of the election for the City and County aforesaid, to admit in to the polling places during said election many persons who were not authorized or required by law to be in said polling places, and take part in said election and the pretended count of ballots, and were kept and maintained in the said places unlawfully and wrongfully by the said officers of said Judge and the military power of the State, under the direct command of the Governor, by reason of which the votes cast at said election were not fairly counted, but the result left in doubt and uncertainty, and for this cause the said election was void and the alleged and pretended votes cast thereat in said city should not be counted.

Fourth. The said Contestant says that at the said election, held as aforesaid, on the 7th day of November, 1899, in the County of Jefferson and City of Louisville, and Warren, Hopkins, Christian, Knox, Whitley, Pulaski, Bell and divers other counties of this Commonwealth, that many thousands of the legal voters thereof, to wit, more than enough thereof to have changed the result of said election, who were in the employment of the Louisville and Nashville Railroad Company and other corporations, were intimidated by the officers and superior employés of said company and corporations by threats of less employment and discharge from the service of the said company and corporations, and were thereby forced and compelled to vote and did, for this cause, vote for the Contestee for the office of Governor, when in truth and in fact they desired to vote for the Contestant, and would have done so but for such intimidation and duress. For this cause the said election held in said counties was and is void.

Fifth. The Contestant says that before the said election on November 7, 1899, the leaders of the Republican party in the Commonwealth corruptly and fraudulently entered into an agreement and conspiracy with the said officers of the Louisville and Nashville Railroad Company and the American Book Company and other corporations and trusts, by which the said companies, corporations and trusts agreed to furnish large sums of money to be used in defeating the Contestant at said election by bribing and corrupting the voters and election officers of this Commonwealth and debauching the public press thereof; and that in pursuance to the said conspiracy the said companies, corporations and trusts did furnish large sums of money, which were so corruptly and unlawfully used in the counties of Jefferson, Warren, Fayette, Breathitt, Hopkins, Daviess, Logan, Todd, Henderson, Pulaski, Whitley, Knox, Bell, Hardin and divers other counties of the Commonwealth, and by which many thousands of the legal voters thereof were bribed and corrupted, and thereby caused to vote for Contestee. Newspapers were purchased and debauched and office s of said election bribed, and the Contestant deprived of many thousand votes which he would have

has been a citizen and resident of the State of Kentucky all his life, and likewise a citizen and resident of the United States all his life. They say further that, as hereinafter more specifically

---

received but for the unlawful and corrupt conspiracy aforesaid, which votes were sufficient to have elected him.

Sixth. The Contestant further says that in the counties of Knox and Lewis, the County Board of Election Officers, whose duty it was, by law, to correctly certify the result of the election held in their respective counties, were compelled by unlawful mandatory injunctions issued by circuit judges and clerks, to sign false returns and certificates of said election, giving to the Contestee large majorities of the votes cast in said counties; and in the county of Knox, the said board was compelled by duress and open threats of violence from a large body of armed citizens of said county, assembled at the county seat, to sign false and fraudulent certificates. In the county of Jefferson, the officers who held said election at the voting places in the city of Louisville, were compelled to sign like false and fraudulent certificates of said election, by duress, and under threats of Sterling B. Toney, one of the circuit judges of the Commonwealth, who announced his purpose to fine and imprison said officers if they did not sign said false certificates. By reason of the duress aforesaid, and the said unlawful mandatory injunctions, the votes in the said counties and all the precincts thereof, were not correctly counted or certified, and the said votes so certified should not now be counted in determining the result of said election. All of said certificates were signed and made under duress, and would not have been signed but for the facts aforesaid.

Seventh. The Contestant says that in pursuance to a conspiracy of the leaders of the Republican party in Kentucky, and the United States Marshal for the District of Kentucky, to intimidate and deter the Democrats and friends of Contestant from voting for him, said Marshall and other officers and persons threatened to indict many of Contestant's supporters in the United States Court for the District of Kentucky for alleged violation of law in connection with said election, and, in pursuance to said conspiracy, caused their threats to be published in the daily press of the State, and in other forms, and upon the day of said election caused Deputy United States marshals to be and remain at the polling places in the city of Louisville, and in various other cities of the Commonwealth, intermeddling with the said election, overawing, threatening and intimidating Democratic voters and their friends and supporters of the Contestant, whereby many voters, to wit, more than enough to have changed the result of said election, were prevented from voting for Contestant, who otherwise would have done so.

Eighth. The Contestant says that after said election and before the meeting of the State Board of Election Commissioners, in the city of Frankfort, a conspiracy was formed and entered into by the Contestee, the Louisville and Nashville Railroad Company, John Whallen, who was its paid agent, and other persons whose names are unknown to Contestant, to bring from

stated the said Taylor was, on November 7, 1899, duly elected
Governor of the State of Kentucky, and the said Marshall duly
elected Lieutenant Governor for the State of Kentucky by the
qualified voters thereof; that each of them afterwards received

---

various sections of this Commonwealth large numbers of desperate armed
men, for the purpose of alarming and intimidating the members of the said
Election Board in the discharge of their duties, and the friends and sup-
porters of said Contestant; and that in pursuance to said conspiracy the
corporations and persons aforesaid, did transport to the City of Frankfort
at said time, a large number of the militia of the State, dressed in citizens'
clothing, and many hundreds of desperate armed men, and unlawfully kept
and maintained said militia and armed men in and about the chamber and
Capitol where said Election Board held its sessions for several days; for
the unlawful purpose of alarming and intimidating the members of said
Board and the good citizens of the Commonwealth; and the said corpora-
tion and persons also caused the military forces of the Commonwealth to
be armed and equipped and held in readiness and the state arsenal to be
guarded by armed men for the unlawful purpose aforesaid, and Democratic
members of the military companies of the state militia to be disarmed and
discharged and their places to be filled with Republicans.

Ninth. The Contestant for further grounds of contest herein says that,
in the County of Jefferson, the County Board of Election officers, whose
duty it was to ascertain and correctly certify the result of said election
held in said County, were compelled by threats of violence and death to
the two Democratic members of said Board to accept, and said Board by
reason of the duress aforesaid, did accept, false, fraudulent and illegal re-
turns from the various precincts in the City of Louisville, which returns
were prepared by the attorneys and agents of the Republican party and
were signed by the precinct officers aforesaid under duress and threats of
fine and imprisonment, and said Board of Election officers, by reason of the
duress aforesaid, based upon their certificate as to the result of said elec-
tion in said county upon the said false, fraudulent and illegal returns
made by the said precinct officers as aforesaid, and for this cause the Con-
testant was deprived of many thousand votes cast for him at said election
and the Contestee was given many thousand illegal votes to which he was
not entitled, to wit, more than enough to have changed the result of the
said election, and for this cause the said election was and is void and the
alleged vote of Jefferson County as certified by said County Board should
not be counted in ascertaining the result of said election in this Common-
wealth.

Tenth. The Contestant further avers that many thousand of persons,
who were not entitled to vote at the said election, on November 7, 1899,
were unlawfully brought into this Commonwealth by the agents of the
Louisville and Nashville Railroad Company and others acting in Contestee's
behalf, and at said election were wrongfully and unlawfully voted for the

in due form a certificate to that effect from the State Board of Election Commissioners of the Commonwealth of Kentucky, and each of them thereafter duly qualified as such officers by taking the oath of office prescribed by law therefor, and thereby each of them became charged with an express public trust for the benefit of the people of the State of Kentucky. They say that the proceedings referred to in the petition herein by which it is alleged that the contests over the offices of Governor and Lieutenant Governor were tried and determined, and by which it is alleged that the authority of these defendants to act respectively as Governor and Lieutenant Governor was terminated, were and are utterly void, and of no effect for the reasons hereinafter stated, and if effect be given to them, and these defendants be thereby deprived of their respective offices of Governor and Lieutenant Governor of Kentucky, and plaintiff, Beckham, be thereby installed in the office of Governor or Lieutenant Governor of Kentucky, these defendants will be thereby deprived by the State of Kentucky of their property without due process of law and both they and the people of Kentucky, and the qualified voters thereof will be deprived of their liberty without due process of law, and will be denied the benefit of a republican form of government, all of which is contrary to the provisions of the fourth section of the fourth article of the said Constitution and to the Fourteenth Amendment to said Constitution, the benefits of which provisions are hereby specially set up and claimed by these defendants both for themselves and for the people of Kentucky, and the qualified voters thereof, whose representatives and trustees these defendants are."

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

" Defendants further say that, if the State, after having furnished to its citizens and electors in a number of its counties official ballots upon which it required them to vote, or not vote

---

Contestee in said election ; that the number of votes so cast were sufficient to have changed the result of said election.

The Contestant will, upon the grounds aforesaid, at the time and place and before the tribunals stated, contest the election of said William S. Taylor to the office of Governor of this Commonwealth."

at all, in the election of a Governor and Lieutenant Governor, shall reject their votes, and thus refuse to allow used them to participate in the election of such officers, merely because they in voting the ballots which the State required them to use, and if the State shall, thereby and on that account, refuse to allow the persons respectively chosen for the office of Governor and Lieutenant Governor by the majority of the qualified voters of the State, including those using the ballots aforesaid, to take their seats and perform the duties of Governor and Lieutenant Governor, and shall in lieu of them seat other persons, then the State will thereby deprive the said citizens and electors, all of whom are both citizens of Kentucky and citizens of the United States, of their political liberty without due process of law, in violation of the Constitution of the United States, and will thereby deny to them the benefits of a republican form of government in violation of the Constitution of the United States; and will thereby also deprive these defendants of their property without due process of law, all of which is contrary to the provisions of the Constitution of the United States."

*     *.     *     *     *     *     *     *

"And defendants further say that if any such pretended meeting of members of the General Assembly was held either on January 31 or February 2, at which any action was taken or attempted to be taken on the reports of said Contest Committees, the said meetings were held secretly, without any notice to any of the Republican members of the General Assembly and without any notice to either of these defendants that such meetings were to be held, and without any opportunity either to the said Republican members or any of them to be present, or any opportunity for either of these defendants to be present at such meetings at which the said contests were to be heard and determined. And if any such meetings were held or attempted to be held on either of those days, and any determination of either of said contests was pretended to have been had, it was utterly void on account of lack of notice, and opportunity to be present or to be heard as just herein stated, as well as for the other reasons heretofore given. And to deprive these defendants or either of them of their offices by such action would

be to deprive them of their property without due process of law, and would be to deprive defendants and the other people of the State of Kentucky, and especially the qualified voters thereof, of their political liberty without due process of law, and to deny to them the benefits of a republican form of government. All of which is contrary to the provisions and guaranties of the Constitution of the United States as well as that of Kentucky."

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Defendants further say that both the offices of Governor and Lieutenant Governor are offices created by the constitution of Kentucky, and, therefore, not subject to abolition by the General Assembly of Kentucky. And, furthermore, it is provided by the constitution of Kentucky, that 'the salaries of public officers shall not be changed during the term for which they were elected,' and defendants say they were elected as heretofore shown to the offices of Governor and Lieutenant Governor, respectively, of the State of Kentucky on November 7, 1899, for a period of four years each, and then and thereby became entitled to exercise the functions of said offices and to receive the salaries and emoluments appertaining thereto, which are large and valuable, and were such when they were thus elected; the salary of the Governor being then and now fixed by law at $6500 per annum; and to take from them their said offices and their said salaries and emoluments by the aforesaid action of said contest tribunals would be to deprive them of their property without due process of law, contrary to the provisions of the Constitution of the United States, and especially of the Fourteenth Amendment thereof."

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Defendants say that the power vested in the Houses of the General Assembly of Kentucky to try contests over elections of Governor or Lieutenant Governor is judicial in its nature, and is subject to the same limitations and restrictions to which the exercise of judicial power is ordinarily subject; that by the constitution of the State of Kentucky and also by the Constitution of the United States, especially the Fifth and Fourteenth Amendments thereof, the exercise of absolute and arbitrary

power by the State or any department thereof, whereby any person shall be deprived of life, liberty, property or the pursuit of happiness, including therein the enjoyment of honors and the occupation of positions of public trust and emolument, is forbidden. But defendants say that if effect be given to the alleged decisions by the said Boards of Contest or the said Houses of the General Assembly as to the said contested elections for Governor or Lieutenant Governor; and these defendants be thereby deprived of the offices of Governor or Lieutenant Governor, and the plaintiff. Beckham be thereby vested with the power of Governor of Kentucky, then not only will the people of Kentucky be deprived of their political liberty without due process of law, but these defendants will also be deprived without due process of law of the right to hold the said offices of Governor and Lieutenant Governor, which are both profitable and honorable, all of which is contrary to and forbidden by both the provisions of the state constitution and of the Constitution of the United States above referred to, and defendants say that if by a proper construction of the constitution of Kentucky the absolute and arbitrary power is given either to the Boards of Contest or the Houses of the General Assembly to take from these defendants the offices of honor, trust and emolument to which they were elected by the people of the State as heretofore alleged, under the false guise of a trial of a contest over said offices, then the said Constitution of the State is itself contrary to the aforesaid provisions of the Constitution of the United States."

The prayer of the defendants was that the bill be dismissed; that J. C. W. Beckham be adjudged a usurper, and that William S. Taylor and John Marshall be, respectively, adjudged the Governor and Lieutenant Governor of the Commonwealth.

The answers were in large part disposed of on demurrer and motion to strike out, and the case was submitted to the Circuit Court for determination on the law and facts without the intervention of a jury, and defendants "moved the court to state in writing the conclusions of fact found separately from the conclusions of law;" but it was agreed that the court might adopt its opinion on demurrer as its statement of its conclusions

of law. This the court did, and found the facts in its judg-ment, which findings included, among others, these:

"Second. William Goebel and J. C. W. Beckham inaugurated a contest for the offices of Governor and Lieutenant Governor respectively before the General Assembly of Kentucky on the second day of January, 1900, against William S. Taylor and John Marshall, and the said contest was finally determined by the General Assembly on the second day of February, 1900, at which time it was adjudged and determined by each House of said General Assembly, acting separately and also in joint ses-sion, that the said William Goebel was duly elected Governor of the Commonwealth of Kentucky for the term beginning De-cember 13, 1899, and was entitled to said office of Governor, and it was then and there in like manner determined by said General Assembly and by each House acting separately and in joint session that the said J. C. W. Beckham was duly elected Lieutenant Governor of said Commonwealth for the same term.

"Third. Immediately after the said determination the oath of office of Governor as provided by law was administered to said Goebel, February 2, 1900, and the oath of office as Lieu-tenant Governor, as provided by law, was in like manner ad-ministered to J. C. W. Beckham.

"Fourth. Said William Goebel died on the third day of Feb-ruary, at 6:45 P.M., and shortly thereafter upon said day J. C. W. Beckham as Lieutenant Governor was sworn, as required by law, to discharge the duties of the office of Governor of the Commonwealth."

Judgment of ouster was rendered in favor of plaintiff and against defendants.

The case was then carried on appeal to the Court of Appeals of Kentucky and the judgment affirmed, 56 S. W. Rep. 177, whereupon a writ of error from this court was allowed by the Chief Justice of that court.

The Journals of the two Houses, attached to the petition as part thereof, showed that the General Assembly convened on January 2, 1900, and that on the third day after its organiza-tion Boards of Contest were appointed pursuant to the statute; that on February 2, 1900, the Board in each of the contests re-

ported to the two Houses that they had heard all the evidence offered by the parties, and that William Goebel had received the highest number of legal votes cast for Governor; that J. C. W. Beckham had received the highest number of legal votes cast for Lieutenant Governor; and that they were duly elected and entitled to those offices. The Journals further showed that on the same day both Houses, with a quorum present, approved and adopted, separately, and in joint session, the reports of the Contest Boards, and declared that William Goebel and J. C. W. Beckham were duly elected Governor and Lieutenant Governor respectively.

It appeared that thereupon said Goebel and Beckham on that day, February 2, took the oath of office; that on January 30 William Goebel was shot by an assassin, receiving a wound from which he afterward died on February 3; and that on January 31 defendant Taylor as Governor issued a proclamation, declaring that a state of insurrection existed at Frankfort, Kentucky, adjourning the General Assembly until February 6, and ordering it then to assemble at the town of London, in Laurel County.

The sessions of the General Assembly on February 2 were not held at the State House, for the reason, as recited in the journals, that it was occupied by a military force, which would not allow the General Assembly to meet there, and thereupon the General Assembly met on that day in the Capitol Hotel in the city of Frankfort. On February 19 the General Assembly met at the State House, and the Senate on that day adopted the following resolution :

"Whereas, on the 31st day of January, 1900, the acting Governor of the Commonwealth of Kentucky, by the use of armed force, dispersed the General Assembly, and has until recently prevented the Senate and House from assembling at their regular rooms and places of meeting ; and,

"Whereas, the General Assembly and each House thereof, after public notice, met in joint and separate sessions in the city of Frankfort, a full quorum of such bodies being present, and adopted the majority reports and resolutions of the Boards of Contest for Governor and Lieutenant Governor of the Common-

wealth of Kentucky, unseating the contestees, W. S. Taylor and John Marshall, as Governor and Lieutenant Governor, and seating the contestants, William Goebel and J. C. W. Beckham, as Governor and Lieutenant Governor, respectively, all of which proceedings, reports and resolutions are set out in the Journals of the two Houses of the General Assembly; and,

"Whereas, this joint assembly is now enabled to meet in its regular place of meeting, and, whilst it adheres to the belief beyond doubt that the action of the General Assembly heretofore taken in reference to said contests is valid, final and conclusive, to remove any doubt that may exist in the minds of any of the people of the Commonwealth; now, be it

"*Resolved*, By the General Assembly of the Commonwealth of Kentucky, in joint session assembled, to the end that all doubt may be removed, if any exists, as to the validity and regularity of the action and proceedings at the times and places shown by the Journals of the two Houses, other than its regular rooms, provided by law, that all the acts, proceedings and resolutions of the Senate and House and of the joint assembly of the two Houses upon or touching the report of the majority of the Boards of Contest for the offices of Governor and Lieutenant Governor, unseating the contestees and seating William Goebel and J. C. W. Beckham, and declaring them to have been elected Governor and Lieutenant Governor, respectively, on the 7th day of November, 1899, is hereby reënacted, readopted and reaffirmed and ratified at this, the regular place of meeting provided by law, at the seat of government in Frankfort, Ky."

The same resolution was adopted by the House, and on February 20 by both Houses in joint session.

The Court of Appeals regarded the disposal of the following contentions of Taylor and Marshall as decisive of the case, namely: (1.) That the proceedings of the Legislature of February 2 were void, because the Legislature had then been adjourned by the Governor until February 6, and no legal session could be held in the meantime. (2.) That William Goebel having died on February 3, the contest for the office of Governor thereby abated, and the action of the Legislature on February 19 and 20 was therefore void. (3.) That the Legislature

took no action on February 2, and that the Journals of these meetings were fraudulently made by the clerk in pursuance of an alleged conspiracy between certain members of the Assembly and contestants. (4.) That the General Assembly acted without evidence and arbitrarily.

The Court of Appeals held that the Governor had no power to adjourn the Legislature, and that his attempt to do so was wholly void, and did not interfere with the right of the Legislature to proceed with its sessions at Frankfort. The only authority relied on to sustain his action was section 36 of the constitution of Kentucky, as follows: " The first General Assembly, the members of which shall be elected under this constitution, shall meet on the first Tuesday after the first Monday in January, eighteen hundred and ninety-four, and thereafter the General Assembly shall meet on the same day every second year, and its sessions shall be held at the seat of government, except in case of war, insurrection or pestilence, when it may, by proclamation of the Governor, assemble, for the time being, elsewhere."

This the court held did not provide for the adjournment of the General Assembly by the Governor after it had assembled, but for the designation of another place at which it might assemble for the time being and organize, when prevented by the causes named from doing so at the capital; and that it was not intended to authorize such action as was taken was clear from section 80, which provided among other things: " In case of disagreement between the two Houses with respect to the time of adjournment, he (the Governor) may adjourn them to such time as he may think proper, not exceeding four months." This showed that the Governor had no power over the time of adjournment of the two Houses, except in cases of disagreement as to that matter between them, and no such disagreement existed here. And even then it did not confer upon him power to name any other place than that in which the legislature might be sitting.

Section 41 also provided: " Neither House, during the session of the General Assembly, shall, without the consent of the other, adjourn for more than three days, nor to any other place

than that in which it may be sitting." By this section either House might, with the consent of the other, adjourn for more than three days, or to any other place than that in which it was sitting; but, it could not have been intended that the Governor should have like power. On the contrary, the powers of the state government were divided into three distinct and independent departments, and the State constitution was intended to maintain the absolute independence of each.

The court further decided that the death of William Goebel on February third did not affect the right of Beckham. If Goebel was elected Governor, and Beckham, Lieutenant Governor, Beckham on February third became entitled to the office of Governor, and had the right to continue the contest to secure what the Constitution guaranteed him, so that if the legislature had not acted until February 19, it had a right then to act on the contest, and its action would be none the less valid because not taken in Goebel's lifetime.

As to the validity of the entries in the Journals and the effect to be given them, the court ruled, citing many authorities,[1] that evidence *aliunde* could not be received to impeach the validity of the record prescribed by the constitution as evidence of the proceedings of the General Assembly, and that the court was without jurisdiction to go behind the record thereby made. Among other things the court said (page 181):

"There is no conflict between the action of the state Canvassing Board and that of the Legislature in these cases. The state Canvassing Board were without power to go behind the returns. They were not authorized to hear evidence and determine who was in truth elected, but were required to give a certificate of election to those who on the face of the returns had received the highest number of votes. For the state Board to have received evidence to impeach the returns before them

---

[1] Cooley on Const. Lim. (5th ed.) 222; *Wright* v. *Defrees*, 8 Ind. 298; *McCulloch* v. *State*, 11 Ind. 424; *State* v. *Moffitt*, 5 Ohio, 358; *Wise* v. *Bigger*, 79 Va. 269; *Sunbury & Erie Railroad Co.* v. *Cooper*, 33 Pa. St. 278; *Fletcher* v. *Peck*, 6 Cranch, 87; *Ex parte McCardle*, 7 Wall. 506; *United States* v. *Des Moines Co.*, 142 U. S. 510, 544; *United States* v. *Old Settlers*, 148 U. S. 427, 466.

would have been for them, in effect, to act as a Board for trying a contested election, and if they had done this, they would have usurped the power vested in the General Assembly by the constitution; for by its express terms only the General Assembly can determine a contested election for Governor and Lieutenant Governor.

"But the certificate of the State Board of Canvassers is no evidence as to who was in truth elected. Their certificate entitles the recipient to exercise the office until the regular constitutional authority shall determine who is the *de jure* officer. The rights of the *de jure* officer attached when he was elected, although the result was unknown until it was declared by the proper constitutional authority. When it was so declared, it was simply the ascertainment of a fact hitherto in doubt, or unsettled. The rights of the *de facto* officer, under his certificate from the Canvassing Board, were provisional or temporary until the determination of the result of the election as provided in the constitution; and upon that determination, if adverse to him, they ceased altogether. Such a determination of the result of the election, by the proper tribunal, did not take from him any preexisting right; for, if not in fact elected, he had only a right to act until the result of the election could be determined."

In respect of the allegation that the action of the General Assembly was void because without evidence and arbitrary, the court held that it must be presumed that the Legislature did its duty in the premises; and further that the objections that the notices of contest were insufficient and that the evidence was equally insufficient; that the Contest Boards were not fairly drawn by lot, and that certain members of the Boards were liable to objection on the ground of partiality, were all in respect of matters confided to the General Assembly to deal with as made by the constitution the sole tribunal to determine such contests.

To the argument that if all the specifications of contestants were true, the election was wholly void, and no one elected, the court replied that it had no means of knowing the grounds on which the General Assembly reached its conclusion; that the

presumptions were in favor of their judgment, and that "when they found as a fact that the contestants received the highest number of legal votes cast in the election in controversy, we are not at liberty to go behind their findings."

The court further held that the proceedings were not in violation of the Fourteenth Amendment, and said:

"The office of Governor being created by the constitution of this State, the instrument creating it might properly provide how the officer was to be elected and how the result of this election should be determined. The provisions of the constitution on this subject do not abridge the privileges or immunities of citizens of the United States. Such an office is not property, and in determining merely the result of the election, according to its own laws, the State deprives no one of life, liberty or property. In creating this office, the State had a right to provide such agencies as it saw fit to determine the result of the election, and it had a right to provide such a mode of procedure as it saw fit. It is wholly a matter of state policy. The people of the State might, by an amendment to their constitution, abolish the office altogether. The determination of the result of an election is purely a political question, and if such suits as this may be maintained, the greatest disorder will result in the public business. It has always been the policy of our law to provide a summary process for the settlement of such contests, to the end that public business shall not be interrupted; but if such a suit as this may be maintained, where will such a contest end?"

Of the seven members of the tribunal, Hazelrigg, C. J., Paynter, Hobson and White, JJ., concurred in the principal opinion by Hobson, J.; and Burnam and Guffy, JJ., in the result, in a separate opinion by Burnam, J., on the ground "that there is no power in the courts of the State to review the finding of the General Assembly in a contested election for the offices of Governor and Lieutenant Governor as shown by its duly authenticated records." Du Relle, J., dissented, holding that the Boards of Contest had no jurisdiction in the matter which they undertook to try, and that the demurrer should have been carried back to the petition and sustained.

The present constitution of the State of Kentucky, of 1891, provides, § 90: "Contested elections for Governor and Lieutenant Governor shall be determined by both Houses of the General Assembly, according to such regulations as may be established by law." This was taken verbatim from the twenty-fourth section of article three of the constitution of 1850.

Section 27 of article III of the constitution of 1799 provided: "Contested elections for a Governor and Lieutenant Governor shall be determined by a committee, to be selected from both Houses of the General Assembly, and formed and regulated in such manner as shall be directed by law."

The statutes of Kentucky provide:

"§ 1535. No application to contest the election of an officer shall be heard, unless notice thereof in writing signed by the party contesting, is given.

"1. The notice shall state the grounds of the contest, and none other shall afterward be heard as coming from such party; but the contestee may make defence without giving counter notice.

"2. In the case of an officer elective by the voters of the whole State, or any judicial district, the notice must be given within thirty days after the final action of the Board of Canvassers."

\* \* \* \* \* \* \* \*

"§ 1596 A, . . .

"8. CONTESTED ELECTION OF GOVERNOR AND LIEUTENANT GOVERNOR. When the election of a Governor or Lieutenant Governor is contested, a Board for determining the contest shall be formed in the manner following:

"First. On the third day after the organization of the General Assembly which meets next after the election, the Senate shall select, by lot, three of its members, and the House of Representatives shall select, by lot, eight of its members, and the eleven so selected shall constitute a Board, seven of whom shall have power to act.

"Second. In making the selection by lot, the name of each member present shall be written on a separate piece of paper, every such piece being as nearly similar to the other as may be.

Each piece shall be rolled up so that the name thereon cannot be seen, nor any particular piece be ascertained or selected by feeling. The whole so prepared shall be placed by the clerk in a box on his table, and after it has been well shaken up and the papers therein well intermixed, the clerk shall draw out one paper, which shall be opened and read aloud by the presiding officer, and so on until the required number is obtained. The persons whose names are so drawn shall be members of the Board.

" Third. The members of the Board so chosen by the two Houses shall be sworn by the Speaker of the House of Representatives to try the contested election, and give true judgment thereon, according to the evidence, unless dissolved before rendering judgment.

" Fourth. The Board shall, within twenty-four hours after its election, meet, appoint its chairman and assign a day for hearing the contest, and adjourn from day to day as its business may require.

" Fifth. If any person so selected shall swear that he cannot, without great personal inconvenience, serve on the Board, or that he feels an undue bias for or against either of the parties, he may be excused by the House from which he was chosen from serving on the Board, and if it appears that the person so selected is related to either party, or is liable to any other proper objection on the score of its partiality, he shall be excused.

" Sixth. Any deficiency in the proper number so created shall be supplied by another draw from the box.

" Seventh. The Board shall have power to send for persons, papers and records, to issue attachments therefor signed by its chairman or clerk, and issue commissions for taking proof.

" Eighth. Where it shall appear that the candidates receiving the highest number of votes given have received an equal number, the right to the office shall be determined by lot, under the direction of the Board. Where the person returned is found not to have been legally qualified to receive the office at the time of his election, a new election shall be ordered to fill the vacancy ; *Provided*, the first two years of his term shall not have expired. Where another than the person returned shall be found to have received the highest number of legal votes given,

such other shall be adjudged to be the person elected and entitled to the office.

"Ninth. No decision shall be made but by the vote of six members. The decision of the Board shall not be final nor conclusive. Such decision shall be reported to the two Houses of the General Assembly, for the future action of the General Assembly. And the General Assembly shall then determine such contest.

"Tenth. If a new election is required it shall be immediately ordered by proclamation of the Speaker of the House of Representatives to take place within six weeks thereafter, and on a day not sooner than thirty days thereafter.

"Eleventh. When a new election is ordered or the incumbent adjudged not to be entitled, his powers shall immediately cease, and, if the office is not adjudged to another it shall be deemed to be vacant.

"Twelfth. If any member of the Board wilfully fails to attend its sessions, he shall be reported to the House to which he belongs, and thereupon such House shall, in its discretion, punish him by fine or imprisonment or both.

"Thirteenth. If no decision of the Board is given during the then session of the General Assembly, it shall be dissolved unless by joint resolution of the two Houses, it is empowered to continue longer."

*Mr. Helm Bruce* and *Mr. W. O. Bradley* for plaintiffs in error. *Mr. James P. Helm* and *Mr. Kennedy Helm* were on the brief.

*Mr. Lawrence Maxwell, Jr.*, and *Mr. Lewis McQuown*, for defendant in error. *Mr. W. S. Pryor* was on their brief.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

It is obviously essential to the independence of the States, and to their peace and tranquility, that their power to prescribe the qualifications of their own officers, the tenure of their offices,

the manner of their election, and the grounds on which, the tribunals before which, and the mode in which, such elections may be contested, should be exclusive, and free from external interference, except so far as plainly provided by the Constitution of the United States.

And where controversies over the election of state officers have reached the state courts in the manner provided by, and been there determined in accordance with, the state constitutions and laws, the cases must necessarily be rare in which the interference of this court can properly be invoked.

In *Boyd* v. *Thayer*, 143 U. S. 135, which was a proceeding *quo warranto*, in which the Supreme Court of Nebraska had held that James E. Boyd had not been for two years preceding his election a citizen of the United States, and hence that under the constitution of the State he was not eligible to the office of Governor, this court took jurisdiction because the conclusion of the state court involved the denial of a right or privilege under the Constitution and laws of the United States, upon which the determination of whether Boyd was a citizen of the United States or not depended, and therefore jurisdiction to review a decision against such right or privilege necessarily existed in this tribunal. *Missouri* v. *Andriano*, 138 U. S. 496. And we said (p. 161): "Each State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen, and the title to offices shall be tried, whether in the judicial courts or otherwise. But when the trial is in the courts, it is a 'case,' and if a defence is interposed under the Constitution or laws of the United States, and is overruled, then, as in any other case decided by the highest court of a State, this court has jurisdiction by writ of error."

So in *Kennard* v. *Louisiana*, 92 U. S. 480, concerning the right of Kennard to the office of associate justice of the Supreme Court of Louisiana, jurisdiction was taken on the ground that the constitutionality of the statute under which the disputed title to office was tried was drawn in question. The court, speaking by Mr. Chief Justice Waite, said: "The question before us is, not whether the courts below, having jurisdiction of the case and the parties, have followed the law, but whether

the law, if followed, would have furnished Kennard the protection guaranteed by the Constitution. Irregularities and mere errors in the proceedings can only be corrected in the state courts. Our authority does not extend beyond an examination of the power of the courts below to proceed at all."

The writ in *Foster* v. *Kansas*, 112 U. S. 201, rested on the same ground.

In each of the foregoing cases, the determination of the right to the offices in dispute was reposed in the judicial courts, and no question was expressly considered by this court as to whether the right to a public office of a State was or was not protected by the Fourteenth Amendment.

In *Wilson* v. *North Carolina*, 169 U. S. 586, 592, the Governor of North Carolina had suspended plaintiff in error as Railroad Commissioner under a statute of that State, and the state Supreme Court had held the action of the Governor a valid exercise of the power conferred upon him, and that it was due process of law within the meaning of the Constitution. A writ of error from this court to review that judgment was granted, and on hearing was dismissed. Mr. Justice Peckham, in delivering the opinion, said: "The controversy relates exclusively to the title to a state office, created by a statute of the State, and to the rights of one who was elected to the office so created. Those rights are to be measured by the statute and by the constitution of the State, excepting in so far as they may be protected by any provision of the Federal Constitution. Authorities are not required to support the general proposition that in the consideration of the constitution or laws of a State this court follows the construction given to those instruments by the highest court of the State. The exceptions to this rule do not embrace the case now before us. We are, therefore, concluded by the decision of the Supreme Court of North Carolina as to the proper construction of the statute itself, and that as construed it does not violate the constitution of the State. The only question for us to review is whether the State, through the action of its Governor and judiciary, has deprived the plaintiff in error of his property without due process of law, or denied to him the equal protection of the laws. We are of opinion

that the plaintiff in error was not deprived of any right guaranteed to him by the Federal Constitution, by reason of the proceedings before the Governor under the statute above mentioned, and resulting in his suspension from office. The procedure was in accordance with the constitution and laws of the State. It was taken under a valid statute creating a state office in a constitutional manner, as the state court has held. What kind and how much of a hearing the officer should have before suspension by the Governor was a matter for the state Legislature to determine, having regard to the constitution of the State. The procedure provided by a valid state law for the purpose of changing the incumbent of a state office will not in general involve any question for review by this court. A law of that kind does not provide for the carrying out and enforcement of the policy of the State with reference to its political and internal administration, and a decision of the state court in regard to its construction and validity will generally be conclusive here. The facts would have to be most rare and exceptional which would give rise in a case of this nature to a Federal question. . . . In its internal administration the State (so far as concerns the Federal government) has entire freedom of choice as to the creation of an office for purely state purposes, and of the terms upon which it shall be held by the persons filling the office. And in such matters the decision of the state court, that the procedure by which an officer has been suspended or removed from office was regular and was under a constitutional and valid statute, must generally be conclusive in this court. . . . Upon the case made by the plaintiff in error, the Federal question which he attempts to raise is so unfounded in substance that we are justified in saying that it does not really exist; that there is no fair color for claiming that his rights under the Federal Constitution have been violated, either by depriving him of his property without due process of law or by denying him the equal protection of the laws."

The grounds on which our jurisdiction is sought to be maintained in the present case are set forth in the errors assigned, to the effect in substance: (1) That the action of the General Assembly in the matter of these contests deprived plaintiffs in

error of their offices without due process of law. (2) That the action of the General Assembly deprived the people of Kentucky of the right to choose their own representatives, secured by the guarantee of the Federal Constitution of a republican form of government to every State; and deprived them of their political liberty without due process of law.

For more than a hundred years the constitution of Kentucky has provided that contested elections for Governor and Lieutenant Governor shall be determined by the General Assembly. In 1799, by a committee, "to be selected from both houses of the General Assembly, and formed and regulated in such manner as shall be directed by law;" since 1850, "by both houses of the General Assembly, according to such regulations as may be established by law."

The highest court of the State has often held and, in the present case has again declared, that under these constitutional provisions the power of the General Assembly to determine the result is exclusive, and that its decision is not open to judicial review. *Batman* v. *Megowan*, 1 Metc. (Ky.) 533; *Stine* v. *Berry*, 96 Ky. 63.[1]

The statute enacted for the purpose of carrying the provisions of the constitution into effect has been in existence in substance since 1799. 1 Morehead and Brown, 593–4; Rev. Stat. Ky. 1852, chap. 32, art. 7, § 1, p. 294. Many of the States have similar constitutional provisions and similar statutes.

We do not understand this statute to be assailed as in any manner obnoxious to constitutional objection, but that plaintiffs in error complain of the action of the General Assembly under the statute, and of the judgment of the state courts declining to disturb that action.

It was earnestly pressed at the bar that all the proceedings were void for want of jurisdiction apparent on the face of the record; that under the constitution and statute, as there was no question of an equal number of votes, or of the legal qualifi-

---

[1] And see *State* v. *Marlow*, 15 Ohio St. 114, 134; *State* v. *Harmon*, 31 Ohio St. 250; *Commonwealth* v. *Garrigues*, 28 Pa. St. 9; *Commonwealth* v. *Leach*, 44 Pa. St. 332; *Royce* v. *Goodwin*, 22 Mich. 496; *Baxter* v. *Brooks*, 29 Ark. 173; *State* v. *Lewis*, 51 Conn. 113.

cations of the candidates, the action of the General Assembly could only be invoked by a contest as to which of the parties had received the highest number of legal votes, but that the notices put forward a case, not of the election of the contestants, but of no election at all, which the Contest Boards and the General Assembly had no jurisdiction to deal with. The notices were, however, exceedingly broad, and set up a variety of grounds, and specifically stated that the contestants would ask the Boards of Contest and the General Assembly to determine that they were legally and rightfully elected Governor and Lieutenant Governor at the said election and that the contestees were not. And the determination of the Boards and of the General Assembly was that contestants had received the highest number of legal votes cast for any candidate for said offices at said election, and were duly and legally elected Governor and Lieutenant Governor, a determination which adjudged the notices to be sufficient, and which did not include any matter not within the jurisdiction of the tribunal.

We repeat, then, that the contention is that, although the statute furnished due process of law, the General Assembly in administering the statute denied it; and that the Court of Appeals in holding to the rule that where a mode of contesting elections is specifically provided by the constitution or laws of a State, that mode is exclusive, and in holding that as the power to determine was vested in the General Assembly of Kentucky, the decision of that body was not subject to judicial revision, denied a right claimed under the Federal Constitution. The Court of Appeals did, indeed, adjudge that the case did not come within the Fourteenth Amendment, because the right to hold the office of Governor or Lieutenant Governor of Kentucky was not property in itself, and, being created by the state Constitution, was conferred and held solely in accordance with the terms of that instrument and laws passed pursuant thereto, so that, in respect of an elective office, a determination of the result of an election, in the manner provided, adverse to a claimant, could not be regarded as a deprivation forbidden by that amendment.

The view that public office is not property has been generally entertained in this country.

In *Butler* v. *Pennsylvania*, 10 How. 402, 416, Butler and others by virtue of a statute of the State of Pennsylvania had been appointed Canal Commissioners for a term of one year with a compensation of four dollars per diem, but during their incumbency another statute was passed whereby the compensation was reduced to three dollars, and it was claimed that their contract rights were thereby infringed. The court drew a distinction between such a situation and that of a contract by which " perfect rights, certain definite, fixed private rights of property, are vested;" and said: "These are clearly distinguishable from measures or engagements adopted or undertaken by the body politic or state government for the benefit of all, and from the necessity of the case, and according to universal understanding, to be varied or discontinued as the public good shall require. The selection of officers, who are nothing more than agents for the effectuating of such public purposes, is matter of public convenience or necessity, and so too are the periods for the appointment of such agents; and neither the one nor the other of these arrangements can constitute any obligation to continue such agents, or to reappoint them, after the measures which brought them into being shall have been found useless, shall have been fulfilled, or shall have been abrogated as even detrimental to the well-being of the public. . . . It follows, then, upon principle, that, in every perfect or competent government, there must exist a general power to enact and to repeal laws; and to create, and change or discontinue, the agents designated for the execution of those laws. Such a power is indispensable for the preservation of the body politic, and for the safety of the individuals of the community. It is true, that this power, or the extent of its exercise, may be controlled by the higher organic law or constitution of the State, as is the case in some instances in the state constitutions, . . ."

In *Crenshaw* v. *United States*, 134 U. S. 99, 104, Mr. Justice Lamar stated the primary question in the case to be: "Whether an officer appointed for a definite time or during good behavior had any vested interest or contract right in his office of

which Congress could not deprive him." And he said, speaking for the court: "The question is not novel. There seems to be but little difficulty in deciding that there was no such interest or right." *Butler* v. *Pennsylvania, supra; Newton* v. *Commissioners,* 100 U. S. 548; *Blake* v. *United States,* 103 U. S. 227; and many other cases.

The decisions are numerous to the effect that public offices are mere agencies or trusts, and not property as such. Nor are the salary and emoluments property, secured by contract, but compensation for services actually rendered. Nor does the fact that a constitution may forbid the legislature from abolishing a public office or diminishing the salary thereof during the term of the incumbent change its character or make it property. True, the restrictions limit the power of the legislature to deal with the office, but even such restrictions may be removed by constitutional amendment. In short, generally speaking, the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right.[1]

The Court of Appeals not only held that the office of Governor or of Lieutenant Governor was not property under the constitution of Kentucky; but moreover, that court was of opinion that the decision of these contested elections did not deprive plaintiffs in error of any preëxisting right.

Our system of elections was unknown to the common law, and the whole subject is regulated by constitutions and statutes passed thereunder. In the view of the Court of Appeals the mode of contesting elections was part of the machinery for ascertaining the result of the election, and hence, the rights of the officer who held the certificate of the State Board of Canvassers "were provisional or temporary until the determination of the result of the election as provided in the constitution,

---

[1] *Sweeny* v. *Poyntz,* Cir. Ct. U. S. Dist. Ky., not yet reported, Taft, J.; *Standeford* v. *Wingate,* 2 Duvall, (Ky.) 440, 443; *Conner* v. *Mayor,* 5 N. Y. 285; *Donahue* v. *Will County,* 100 Ill. 94; *Attorney General* v. *Jochim,* 99 Mich. 358; *Smith* v. *Mayor,* 37 N. Y. 518; *State* v. *Hawkins,* 44 Ohio St. 98; *State* v. *Davis,* 44 Mo. 129; *State* v. *Duvall,* 26 Wis. 415, 418; *Prince* v. *Skillen,* 71 Maine, 361; *Douglas Co.* v. *Timme,* 32 Neb. 272; *Lynch* v. *Chase,* 55 Kan. 367; *Shelby* v. *Alcorn,* 36 Miss. 273.

and upon that determination, if adverse to him, .they ceased altogether." In fact, the statute provided that when the "incumbent was adjudged not to be entitled, his powers shall immediately cease," and under the constitution the holder of the certificate manifestly held it for the time being subject to the issue of a contest if initiated.

It is clear that the judgment of the Court of Appeals in declining to go behind the decision of the tribunal vested by the state constitution and laws, with the ultimate determination of the right to these offices, denied no right secured by the Fourteenth Amendment.

But it is said that the Fourteenth Amendment must be read with section 4 of article IV of the Constitution, providing that: " The United States shall guarantee to every State in this Union a republican form of government, and shall protect each of them against invasion; and on application of the legislature, or of the executive (when the legislature cannot be convened,) against domestic violence." It is argued that when the State of Kentucky entered the Union, the people "surrendered their right of forcible revolution in state affairs," and received in lieu thereof a distinct pledge to the people of the State of the guarantee of a republican form of government, and of protection against invasion, and against domestic violence; that the distinguishing feature of that form of government is the right of the people to choose their own officers for governmental administration; that this was denied by the action of the General Assembly in this instance; and, in effect, that this court has jurisdiction to enforce that guarantee, albeit the judiciary of Kentucky was unable to do so because of the division of the powers of government. And yet the writ before us was granted under § 709 of the Revised Statutes to revise the judgment of the state court on the ground that a consitutional right was decided against by that court.

It was long ago settled that the enforcement of this guarantee belonged to the political department. Luther v. Borden, 7 How. 1. In that case it was held that the question, which of the two opposing governments of Rhode Island, namely, the charter government or the government established by a volun-

tary convention, was the legitimate one, was a question for the determination of the political department; and when that department had decided, the courts were bound to take notice of the decision and follow it; and also that as the Supreme Court of Rhode Island holding constitutional authority not in dispute, had decided the point, the well settled rule applied that the courts of the United States adopt and follow the decisions of the state courts on question which concern merely the constitution and laws of the State.

We had occasion to refer to *Luther* v. *Borden* in *In re Duncan, Petitioner,* 139 U. S. 449, 461, and we there observed: "Mr. Webster's argument in that case took a wider sweep, and contained a masterly statement of the American system of government, as recognizing that the people are the source of all political power, but that as the exercise of governmental powers immediately by the people themselves is impracticable, they must be exercised by representatives of the people; that the basis of representation is suffrage; that the right of suffrage must be protected and its exercise prescribed by previous law, and the results ascertained by some certain rule; that through its regulated exercise each man's power tells in the constitution of the government and in the enactment of laws; that the people limit themselves in regard to the qualifications of electors and the qualifications of the elected, and to certain forms for the conduct of elections; that our liberty is the liberty secured by the regular action of popular power, taking place and ascertained in accordance with legal and authentic modes; and that the Constitution and laws do not proceed on the ground of revolution or any right of revolution, but on the idea of results achieved by orderly action under the authority of existing governments, proceedings outside of which are not contemplated by our institutions. Webster's Works, vol. 6, p. 217. . . . The State of Texas is in full possession of its faculties as a member of the Union, and its legislative, executive and judicial departments are peacefully operating by the orderly and settled methods prescribed by its fundamental law. Whether certain statutes have or have not binding force, it is for the State to determine, and that deter-

mination in itself involves no infraction of 'the Constitution of the United States, and raises no Federal question giving the courts of the United States jurisdiction."

These observations are applicable here. The Commonwealth of Kentucky is in full possession of its faculties as a member of the Union, and no exigency has arisen requiring the interference of the General Government to enforce the guarantees of the Constitution, or to repel invasion, or to put down domestic violence. In the eye of the Constitution, the legislative, executive and judicial departments of the State are peacefully operating by the orderly and settled methods prescribed by its fundamental law, notwithstanding there may be difficulties and disturbances arising from the pendency and determination of these contests. This very case shows that this is so, for those who assert that they were aggrieved by the action of the General Assembly, properly accepted the only appropriate remedy, which under the law was within the reach of the parties. That this proved ineffectual as to them, even though their grounds of complaint may have been in fact well founded, was the result of the constitution and laws under which they lived and by which they were bound. Any remedy beside that is to be found in the august tribunal of the people, which is continually sitting, and over whose judgments on the conduct of public functionaries the courts exercise no control.

We must decline to take jurisdiction on the ground of deprivation of rights embraced by the Fourteenth Amendment, without due process of law, or of the violation of the guarantee of a republican form of government by reason of similar deprivation.

As remarked by Chief Justice Taney in *Luther* v. *Borden :* " The high power has been conferred on this court of passing judgment upon the acts of the state sovereignties, and of the legislative and executive branches of the Federal government, and of determining whether they are beyond the limits of power marked out for them respectively by the Constitution of the United States. This tribunal, therefore, should be the last to overstep the boundaries which limit its own jurisdiction. And while it should always be ready to meet any question confided

to it by the Constitution, it is equally its duty not to pass beyond its appropriate sphere of action, and to take care not to involve itself in discussions which properly belong to other forums."

*Writ of error dismissed.*

MR. JUSTICE MCKENNA concurred in the result.

MR. JUSTICE BREWER, with whom concurred MR. JUSTICE BROWN, dissenting.

I am unable to concur in all that is said by the Chief Justice in the opinion just announced, and will state briefly wherein I dissent.

An office to which a salary is attached, in a case in which the controversy is only as to which of two parties is entitled thereto, has been adjudged by this court, and rightfully, to be property within the scope of that clause of the Fourteenth Amendment, which forbids a state to " deprive any person of life, liberty or property without due process of law." In *Kennard* v. *Louisiana*, 92 U. S. 480, Kennard was appointed a justice of the Supreme Court of Louisiana. Morgan claimed to be entitled thereto, and brought suit to settle the title to the office. The Supreme Court of the State decided in favor of Morgan, and Kennard sued out a writ of error from this court on the ground that the judgment had deprived him of his office, without due process of law, in violation of the foregoing provision of the Fourteenth Amendment. Of course, neither life nor liberty were involved, and the jurisdiction of this court could be sustained only on the ground that the property of Kennard was taken from him, as alleged, without due process of law. This court unanimously sustained the jurisdiction, but on examination of the proceedings found that there had been due process of law, and therefore affirmed the judgment of the Supreme Court of Louisiana. In *Foster* v. *Kansas*, 112 U. S. 201, the Supreme Court of Kansas had, in *quo warranto* proceedings, ousted Foster from the office of county attorney of Saline County, and there was presented a motion to dismiss as well

as one to affirm. This court unanimously held that the motion to dismiss must be overruled, saying (p. 206):

"As the question of the constitutionality of the statute was directly raised by the defendant, and decided against him by the court, we have jurisdiction, and the motion to dismiss must be overruled."

At the same time it affirmed the decision of the Supreme Court of the State on the ground that the proceedings showed due process of law. In *Boyd* v. *Thayer*, 143 U. S. 135, the Supreme Court of Nebraska had, in an appropriate action, rendered judgment ousting Boyd from the office of governor of the State, and placing Thayer in possession. On error to this court we took jurisdiction of the case, and reversed the judgment of the Supreme Court of Nebraska, thus restoring Boyd to the office from which he had been ousted by the judgment of that court. In that case there was a dissenting opinion by Mr. Justice Field on the ground of jurisdiction, he saying (p. 182):

"I dissent from the judgment just rendered. I do not think that this court has any jurisdiction to determine a disputed question as to the right to the governorship of a State, however that question may be decided by its authorities."

In the late case of *Wilson* v. *North Carolina*, 169 U. S. 586, in which the judgment of the Supreme Court of the State, confirming the action of governor, in suspending a railroad commissioner, was sustained, and the writ of error dismissed, the dismissal was not placed on the ground that the office, with its salary, was not property to be protected by the Fourteenth Amendment, but, as said Mr. Justice Peckham, speaking for the court (p. 595):

"Upon the case made by the plaintiff in error, the Federal question which he attempts to raise is so unfounded in substance that we are justified in saying that it does not really exist; that there is no fair color for claiming that his rights under the Federal Constitution have been violated, either by depriving him of his property without due process of law, or by denying him the equal protection of the laws."

We have thus, in four cases, coming at successive times through

MR. JUSTICE BREWER and MR. JUSTICE BROWN, dissenting.

a period of twenty-five years, had before us the question of the validity of judgments of the highest courts of separate States, taking office from one person and giving it to another, in three of which we unhesitatingly sustained our jurisdiction to review such judgments, two of which we affirmed, on the ground that the proceedings in the state court disclosed due process of law, and that, therefore, the rights of the plaintiff in error were not infringed; in the third of which we held that the proceedings could not be sustained, and reversed the judgment of the state court, ousting one person from the high office of governor of the State and giving it to another; and in the fourth of which, while we dismissed the writ of error, it was not on the ground that there was no property involved, but because the reasons assigned for a review were so frivolous as not to call for consideration. Such a series of decisions should not now be disturbed, except upon very cogent and satisfactory reasons. And this case, it must be borne in mind, is exactly like the others, a proceeding in error to review the judgment of the highest court of a state in an action to remove an incumbent from his office.

Aside from these adjudications, I am clear, as a matter of principle, that an office to which a salary is attached is, as between two contestants for such office, to be considered a matter of property. I agree fully with those decisions which are referred to, and which hold that as between the State and the officeholder there is no contract right either to the term of office or the amount of salary, and that the legislature may, if not restrained by constitutional provisions, abolish the office or reduce the salary. But when the office is not disturbed, when the salary is not changed, and when, under the constitution of the State, neither can be by the legislature, and the question is simply whether one shall be deprived of that office and its salary, and both given to another, a very different question is presented, and in such a case to hold that the incumbent has no property in the office with its accompanying salary does not commend itself to my judgment.

While not concurring in the order of dismissal, I am of opinion that the judgment of the Court of Appeals of Kentucky should be affirmed. The State of Kentucky has provided that

contests in respect to the office of governor and lieutenant governor shall be decided by the General Assembly. Such provision is not uncommon, is appropriate, and reasonable. The contestants, William Goebel and J. C. W. Beckham, filed with the General Assembly within due time their notices of contest. Those notices were broad enough to justify action by the General Assembly, and a decision setting aside the award of the canvassing board and giving to the contestants their offices. The prescribed procedure was followed, the committee authorized by statute was selected, its report made, and upon that a decision awarding to the contestants the offices. It is true that the first decision of the General Assembly was made at a secret session outside its ordinary place of meeting, and without notice except to those who were supposed to be willing to concur in the report of the committee. If that ended the proceedings I should be strongly inclined to hold that the decision thus rendered could not be sustained. For when a tribunal is constituted of several members I understand that all have a right to be present, and if any session is held elsewhere than at the appointed time and place each one must be notified in order that he may have the opportunity of being present, and contributing by his advice and opinion to the final judgment. But the record does not stop with this award of a part of the assembly in secret session, for subsequently, when the General Assembly was in session at its regular place of meeting, in the discharge of its ordinary duties, and at a time prescribed for its meeting, the action taken on February 2 was ratified and confirmed, both in single and joint session. Now, I agree with those members of the Court of Appeals of Kentucky who hold that this final action of the General Assembly is conclusive. I do not ignore the many allegations of wrong, such as that the selection of the committee was not by lot, as prescribed by the laws, but was a trick on the part of the clerks of the assembly, and it must be conceded that the outcome of that drawing lends support to this allegation. Curious results sometimes happen by chance, but when those results happen so largely along the lines of the purposes of those who have control of the supposed chance, it is not strange that outsiders are apt to feel that purpose, and not

chance determined the result.  Be all these things as they may, the General Assembly was constituted as the tribunal to conduct and supervise the contest.  It approved what took place, and it is familiar law that no question can be raised in the courts as to the honesty or integrity of the members of the legislature in the discharge of their duties.  Whatever of purity or honesty may be in fact lacking in the conduct of any one of them is a matter to be inquired into between his constituents and himself, and it is no part of the province of the judiciary to challenge or question the integrity of his action.  So we have the case of a committee apparently selected by lot, the propriety of whose action was approved by the tribunal having charge of the controversy, the report of that committee in favor of the contestants, and the judgment of the assembly, not merely at the secret session, but later, when all were present, or were called upon to be present, approving such report.  This in my opinion constitutes due process of law within the meaning of the Fourteenth Amendment, and I agree with the Court of Appeals of Kentucky that upon that award thus made by the proper tribunal, no other judgment can be entered than that which sustains it.  But because, as I understand the law, this court has jurisdiction to review a judgment of the highest court of a State ousting one from his office, and giving it to another, a right to inquire whether that judgment is right or wrong in respect to any Federal question, such as due process of law, I think the writ of error should not be dismissed, but that the judgment of the Court of Appeals of Kentucky should be affirmed.

MR. JUSTICE HARLAN, dissenting:

At the regular election held in Kentucky on the 7th day of November, 1899, William S. Taylor and William Goebel were, respectively, the Republican and Democratic candidates for Governor of that Commonwealth.

As required by law, the returns of the election were made to the Secretary of State.

Upon examining and canvassing the returns, the officers charged with the duty of ascertaining the result of the election

certified, as to the office of Governor, that Taylor "received the highest number of votes given for that office, as certified to the Secretary of State, and is, therefore, duly and regularly elected for the term prescribed by the Constitution." According to the returns upon which that certificate was based Taylor received 193,714 votes and Goebel 191,331.

It cannot be doubted that the certificate awarded to Taylor established at least his *prima facie* right to the Governorship, and that he could not be deprived of that right except upon a contest in the mode prescribed by law, and upon proof showing that Goebel was legally entitled to the office. To deprive him of that right illegally was an injury both to him and to the people of the State. "The very essence of civil liberty," it was said in *Marbury* v. *Madison*, 1 Cranch, 137, "is the right of every individual to claim the protection of the laws, whenever he receives an injury."

The Constitution of Kentucky provides that the Governor "shall be elected for the term of four years by the qualified voters of the State. The person having the highest number of votes shall be Governor; but if two or more shall be equal and highest in votes, the election shall be determined by lot, in such manner as the General Assembly may direct;" and that the Governor "shall at stated times receive for his services a compensation to be fixed by law." Const. Kentucky, §§ 70, 74. That instrument further provides that "contested elections for Governor and Lieutenant Governor shall be determined by both Houses of the General Assembly, according to such regulations as may be established by law." § 90.

Taylor, having received his certificate of election based upon the returns to the Secretary of State, took the oath of office as Governor on December 12, 1899 — the oath being administered by the Chief Justice of the Court of Appeals of Kentucky—and entered at once upon the discharge of his duties, taking possession of the public buildings provided for the Governor, as well as of the books, archives and papers committed by law to the custody of that officer. After that and until he was lawfully ousted, his acts, as Governor, in conformity to law, were binding upon every branch of the state government and upon the people.

MR. JUSTICE HARLAN, dissenting.

Within thirty days after the certificate of election was awarded to Taylor he was served by Goebel with notice of contest for the office of Governor.

By the statutes of Kentucky relating to contested elections for Governor and Lieutenant Governor it is provided:

" When the election of a Governor or Lieutenant Governor is contested a Board for determining the contest shall be formed in the manner following:

" First. On the third day after the organization of the General Assembly, which meets next after the election, the Senate shall select by lot three of its members, and the House of Representatives shall select by lot eight of its members, and the eleven so selected shall constitute a Board, seven of whom shall have power to act.

" Second. In making the selection by lot the name of each member shall be written on a separate piece of paper, every such piece being as nearly similar to the other as may be. Each piece shall be rolled up so that the name thereon cannot be seen, nor any particular piece be ascertained or selected by feeling. The whole so prepared shall be placed by the clerk in a box on his table, and, after it has been well shaken and the papers therein well intermixed, the clerk shall draw out one paper, which shall be opened and read aloud by the presiding officer, and so on until the required number is obtained. The persons whose names are so drawn shall be members of the Board.

" Third. The members of the Board so chosen by the two Houses shall be sworn by the Speaker of the House of Representatives to try the contested election, and give true judgment thereon, according to the evidence, unless dissolved before rendering judgment.

" Fourth. The board shall, within twenty-four hours after its election, meet, appoint its chairman and assign a day for hearing the contest, and adjourn from day to day as its business may require.

" Fifth. If any person so selected shall swear that he cannot, without great personal inconvenience, serve on the Board, or that he feels an undue bias for or against either of the parties,

he may be excused by the House from which he was chosen from serving on the Board, and if it appears that the person so selected is related to either party, or is liable to any other proper objection on the score of his partiality, he shall be excused.

"Sixth. Any deficiency in the proper number so created shall be supplied by another draw from the box.

"Seventh. The Board shall have power to send for persons, papers and records, to issue attachments therefor, signed by its chairman or clerk, and issue commissions for taking proof.

"Eighth. Where it shall appear that the candidates receiving the highest number of votes given have received an equal number, the right to the office shall be determined by lot, under the direction of the Board. Where the person returned is found not to have been legally qualified to receive the office at the time of his election, a new election shall be ordered to fill the vacancy: *Provided*, The first two years of his term shall not have expired. Where another than the person returned shall be found to have received the highest number of legal votes given, such other shall be adjudged to be the person elected and entitled to the office.

"Ninth. No decision shall be made but by the vote of six members. The decision of the Board shall not be final nor conclusive. Such decision shall be reported to the two Houses of the General Assembly, for the future action of the General Assembly. And the General Assembly shall then determine such contest.

"Tenth. If a new election is required it shall be immediately ordered by proclamation of the Speaker of the House of Representatives, to take place within six weeks thereafter, and on a day not sooner than thirty days thereafter.

"Eleventh. When a new election is ordered or the incumbent adjudged not to be entitled, his powers shall immediately cease, and, if the office is not adjudged to another, it shall be deemed to be vacant.

"Twelfth. If any member of the Board wilfully fails to attend its sessions, he shall be reported to the House to which he belongs, and thereupon such House shall, in its discretion, punish him by fine and imprisonment, or both.

Mr. Justice Harlan, dissenting.

"Thirteenth. If no decision of the Board is given during the then session of the General Assembly, it shall be dissolved, unless by joint resolution of the two Houses it is empowered to continue longer." Rev. Stat. Kentucky, § 1596 *A.*

It may be here observed that the jurisdiction conferred by the statute upon the Board of Contest appointed by the Legislature is not without limit. The power given to determine contested elections for Governor and Lieutenant Governor is attended by the condition that the determination of the contest shall be according to such regulations as may be established by law. In words too clear to require construction the powers of a Board of Contest are restricted so that (1) if the votes were not accurately summed up, the error might be corrected; (2) if illegal votes were cast they might be thrown out; (3) in the event "the candidates receiving the highest number of votes given have received an equal number, the right to the office shall be determined by lot"; (4) if the person returned as elected was not legally qualified to receive the office at the election, a new election must be ordered to fill the vacancy; (5) if another than the person returned is found "to have received the highest number of legal votes *given,* such other shall be adjudged to be the person elected and entitled to the office." The statute has been so construed by the highest court of Kentucky in *Leeman* v. *Hinton,* 1 Duvall, 38. That was a common law action involving the title to an office. The defendant relied upon the decision of a Board of Contest to the effect that Leeman's claim to the office rested upon an election held in each precinct under the supervision of military officers who overawed the majority of the voters in the county. The Court of Appeals of Kentucky decided in favor of Leeman, saying: "But the authority to decide as to the freedom and equality of elections has not been conferred by the Legislature upon the Board for trying contested elections, but forms a part of the general jurisdiction of the court." In the previous case of *Newcum* v. *Kirtly,* 13 B. Mon. 522—which was a contested election case in which the Board assumed to count votes *not cast,* but which *would have been cast* if the polls had not been closed too soon—the court said that "the necessary and certain import of

the provision is that the contestant shall not be adjudged to be entitled to the office unless the Board find that he has *received* the highest number of legal votes *given*."

Let it also be observed that the Board of Contest in this case was not given jurisdiction to throw out all the votes cast in a particular city, county or section of the State because, in its judgment, the freedom of the election in such city, county or section was destroyed by military or other interference. In other words, the Board was without jurisdiction to throw out legal votes actually given, and was bound to respect the mandate of the constitution that "the person *having* the highest number of votes *shall be* Governor,'' as well as the mandate of the statute that the person "found to have *received* the highest number of votes . . . *shall be* adjudged to be the person elected and entitled to the office."

I remark further that the members elected to try the contested election were required by the statute "to give true judgment *according to the evidence*."

As to the Legislature, it was made its duty by express words to determine the contest, without regarding the decision of the Board as final or conclusive. But as already suggested, its jurisdiction to act was not without limit; for, in addition to the restrictions above referred to, by the statute under which it proceeded no application to contest the election of an officer could be heard unless notice thereof in writing, signed by the party contesting, had been given; and "the notice shall state the grounds of the contest, and none other shall afterward be heard as coming from such party, but the contestee may make defence without giving counter notice." Rev. Stat. Kentucky, § 1535. The Board of Contest, as the court below has said, "was only a preliminary agent *to take evidence* and *report* the *facts* to the General Assembly. The Assembly itself finally determined the contest." As the General Assembly could determine the contest only upon the grounds set forth in the contestant's notice, it had no authority or jurisdiction to oust the incumbent unless those grounds or some of them were sustained by proof laid before it. If no proof was laid before it, then the *prima facie* right of the incumbent based upon the certificate awarded to him, must prevail.

MR. JUSTICE HARLAN, dissenting.

With these preliminary observations as to the trial by a Board of Contest of a contested election for Governor, and as to the powers of the Legislature in determining such contest finally as between the parties, I come to the consideration of the grounds upon which the majority of the court have dismissed the present writ of error.

The Board of Contest in their report of January 30, 1900, say : "In our opinion William Goebel was elected Governor of the Commonwealth of Kentucky on the 7th day of November, 1899, and that he then and there received the highest number of legal votes cast for any one for the office of Governor at said election, and we therefore respectfully suggest that this report be approved, and a resolution adopted by the General Assembly declaring the said William Goebel Governor-elect of the Commonwealth of Kentucky for the term commencing the 12th day of December, 1899. We decide that said William Goebel has received the highest number of legal votes, and is adjudged to be the person elected to said office of Governor for the term prescribed by law."

The report was not accompanied either by any abstract of the evidence or any recital of the grounds upon which it based the statement that Goebel had received the highest number of legal votes. Nor was the evidence itself transmitted to the Legislature—not a line nor a word of it. According to the uncontradicted statement made by counsel at the argument, the proof made nearly two thousand pages of typewriting. The report simply followed the words of the statute and stated that Goebel had received "the highest number of legal votes," giving no basis, not the slightest, upon which the Legislature could determine the correctness of that statement.

Immediately after the Board's report reached the body claiming to be the lawful Legislature of the State, that body—of course without reading the evidence, or causing it to be read, for it had no evidence before it—approved the report, and declare Goebel to have been legally elected Governor. Upon that action alone the present suit was based, and by the judgment of the highest court of Kentucky such action was declared to be conclusive upon the judiciary.

The first question to be considered is whether Taylor has been denied by the judgment of the state court any right or privilege secured to him by the Constitution of the United States. The appellant invokes the clause of the Fourteenth Amendment declaring that "no State shall deprive any person of life, liberty or property, without due process of law." There ought not, at this day, to be any doubt as to the objects which were intended to be 'attained by the requirement of due process of law. "They were intended," this court has said, "to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice." *Bank* v. *Okely*, 4 Wheat. 244.

The majority of this court decide that an office held under the authority of a State cannot in any case be deemed property within the meaning of the Fourteenth Amendment, and hence, it is now adjudged, the action of a state Legislature or state tribunal depriving one of a state office—under whatever circumstances or by whatever mode that result is accomplished—cannot be regarded as inconsistent with the Constitution of the United States. Upon that ground the court declines to take. jurisdiction of this writ of error. If the court had dismissed the writ or affirmed the judgment upon the ground that there had been no violation of the principles constituting due process of law, its action would not have been followed by the evil results which, I think, must inevitably follow from the decision now rendered.

Let us see whether, in dismissing the writ of error for want of jurisdiction, the majority have not departed from the rulings of this court in former cases. This question, it cannot be doubted, is one of serious moment. But what was said by Chief Justice Marshall, speaking for this court in *Cohens* v. *Virginia*, 6 Wheat. 404, may well be repeated: "It is most true that this court will not take jurisdiction if it should not; but it is equally true that it must take jurisdiction, if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the Constitution. We may not pass it by because it is doubtful. With whatever

doubts, with whatever difficulties, a case may be attended, we must decide it if it be brought before us. We have no more right to decline the exercise of jurisdiction if it is given than to usurp that which is not given. The one or the other would be treason to the Constitution. Questions may occur which we would gladly avoid; but we cannot avoid them."

The first case in this court relating to this subject is *Kennard* v. *Louisiana*, 92 U. S. 480. That was a writ of error brought by Kennard to review the final judgment of the Supreme Court of Louisiana declaring that he was not a member of that court. "The case," the report states, "was then brought here *upon the ground* that the State of Louisiana acting under the law, through her judiciary, had deprived Kennard of his office without due process of law, in violation of that provision of the Fourteenth Amendment of the Constitution of the United States which prohibits any State from depriving any person of life, liberty or property, without due process of law." Looking also into the printed arguments filed in that case, on behalf of the respective parties, I find that the attorney for the plaintiff in error, a lawyer of distinction, insisted that the *sole* question presented for determination by this court was whether the final judgment of the state court deprived Kennard of his office in violation of the above clause of the Fourteenth Amendment. And this view was not controverted by the attorney for the defendant, also an able lawyer. The latter contended that the Fourteenth Amendment had no application because in what was done no departure from the principles of due process of law had occurred. The opinion of Chief Justice Waite delivering the judgment of this court thus opens: "The sole question presented for our consideration in this case, as stated by the counsel for the plaintiff in error, is, whether the State of Louisiana, acting under the statute of January 15, 1873, through her judiciary, has deprived Kennard of his office without due process of law." Of course, this court had no jurisdiction to inquire whether there had been due process of law in the proceedings in the state court, unless the office in dispute or the right to hold it was property within the meaning of the Fourteenth Amendment, or unless

Kennard's liberty was involved in his holding and discharging the duties of the office to which, as he insisted, he had been lawfully elected. But this court took jurisdiction of the case and affirmed the judgment of the Supreme Court of Louisiana upon the ground that the requirement in the Fourteenth Amendment of due process of law had not been violated. If, in the judgment of this court, as constituted when the *Kennard* case was decided, an office held under the authority of a State was not "property" within the meaning of the Fourteenth Amendment, the case would have been disposed of upon the ground that no Federal right had been or could have been violated, and the court would not have entered upon the inquiry as to what, under the Fourteenth Amendment, constituted due process of law in a case of which—according to the principles this day announced—it had no jurisdiction.

In *Foster* v. *Kansas,* 112 U. S. 201—which was a writ of error to review the final judgment of the Supreme Court of Kansas—the sole issue was as to the right of Foster to hold the office of county attorney. The defendant in error moved to dismiss the writ for want of jurisdiction in this court, and accompanied the motion with a motion to affirm. This court refused to dismiss the case, and referring to *Kennard* v. *Louisiana,* affirmed the judgment upon the ground that there had been, in its opinion, no departure from due process of law in the proceedings to remove Foster. It never occurred to the court, nor to any attorney in the case, that the Fourteenth Amendment did not embrace the case of a state office from which the incumbent was removed without due process of law. If such an office was not deemed property within the meaning of that Amendment, that was an end of the case here. But this court took jurisdiction and disposed of the case upon the ground that the requirement in the Federal Constitution of due process of law had been observed.

In *Boyd* v. *Thayer,* 143 U. S. 135, which came here upon writ of error to review the final judgment of the Supreme Court of Nebraska ousting Boyd from the office of Governor, and putting Thayer into that position, all the Justices, except Mr. Justice Field, concurred in holding that this court had

MR. JUSTICE HARLAN, dissenting.

jurisdiction of the case. In his dissenting opinion Mr. Justice Field observed: " I do not think this court had any jurisdiction to determine a disputed question as to the right to the governorship of a State, however that question may be decided by its authorities." He continued, quoting the language of Mr. Justice Nelson in another case: " ' The former [General Government] in its appropriate sphere is supreme; but the States within the limits of their powers not granted, or, in the language of the Tenth Amendment " reserved," are as independent of the General Government as that Government within its sphere is independent of the States. *The Collector* v. *Day,* 11 Wall. 113, 124.' In no respect is this independence of the States more marked, or more essential to their peace and tranquillity, than in their absolute power to prescribe the qualifications of all their state officers, from their chief magistrate to the lowest official employed in the administration of their local government; to determine the matter of their election, whether by open or secret ballot, and whether by local bodies or by general suffrage; the tenure by which they shall hold their respective offices; the grounds on which their election may be contested, the tribunals before which such contest shall be made, the manner in which it shall be conducted; and the effect to be given to the decision rendered. With none of these things can the Government of the United States interfere. In all these particulars the States, to use the language of Mr. Justice Nelson, are as independent of the General Government as that Government within its sphere is independent of the States. Its power of interference with the administration of the affairs of the State and the officers through whom they are conducted extends only so far as may be necessary to secure to it a republican form of government, and protect it against invasion, and also against domestic violence on the application of its legislature, or of its executive when that body cannot be convened. Const. Art. IV, sec. 4. Except as required for these purposes, it can no more interfere with the qualifications, election and installation of the state officers than a foreign government. And all attempts at interference with them in those respects by the executive, legislative or judicial departments of the General Government are in my

judgment so many invasions upon the reserved rights of the States and assaults upon their constitutional autonomy. No clause of the Constitution can be named which in any respect gives countenance to such invasion. The fact that one of the qualifications prescribed by the State for its officers can only be ascertained and established by considering the provisions of a law of the United States in no respect authorizes an interference by the General Government with the state action."

This court had a different view of these questions, and, taking jurisdiction, considered the merits of the case, so far as it involved Federal questions, and rendered a judgment which, by its necessary operation, put into the office of Governor of Nebraska one whom the highest court of that State had adjudged not to be the lawful incumbent.

The latest case involving the present question is *Wilson* v. *North Carolina*, 169 U. S. 586. That was an action in the nature of *quo warranto* to test the title to a state office. Judgment was rendered for the plaintiff. The defendant claimed that the state statute and the action taken under it not only deprived him of his office without due process of law, but denied to him the equal protection of the laws, both in violation of the Fourteenth Amendment. In this court a motion to dismiss the writ of error was sustained upon the ground that, looking at what occurred in the state court, there was "no fair color for claiming that his (the plaintiff's) rights under the Federal Constitution have been violated, either by depriving him of his property without due process of law or by denying him the equal protection of the laws." After observing that this court would be very reluctant to decide that we had jurisdiction in the case presented and could supervise and review the political administration of a state government by its own officials and through its own courts, great care was taken to say: "The jurisdiction of this court would only exist in case there had been, by reason of the statute and the proceedings under it, such a plain and substantial departure from the fundamental principles upon which our Government is based that it could with truth and propriety be said that if the judgment were suffered to remain, the party aggrieved would be deprived of

his life, liberty or property in violation of the provisions of the Federal Constitution." Here, as I think, is a distinct declaration that this court has jurisdiction to review the final judgment of a state court, involving the title to a state office, where there has been a plain and substantial departure from the principles that underlie the requirement of due process of law.  The opinion in *Wilson* v. *North Carolina* shows a deliberate consideration of the scope of the Fourteenth Amendment, and a refusal to hold, as is now held, that a contest about a state office could not, under any circumstances, involve rights secured by that Amendment. We there substantially declared that the constitutional requirement of due process of law could be enforced by this court where, in depriving a party of a state office, there had been a plain and substantial departure from the fundamental principles upon which our Government is based.

It thus appears that in four cases, heretofore decided, this court has proceeded upon the ground that to deprive one without due process of law of an office created under the laws of a State, presented a case under the Fourteenth Amendment to the Constitution of the United States of which we could take cognizance and inquire whether there had been due process of law.

Nothing to the contrary was decided in the *Sawyer* case, 124 U. S. 8. That case contains no suggestion that an office is not property. The only point there in judgment was that a court of equity could not control the appointment or removal of public officers. The court said: "The reasons which preclude a court of equity from interfering with the appointment or removal of public officers of the government from which the court derives its authority apply with increased force when the court is a court of the United States and the officers in question are officers of a State." But care was taken further to say: "If a person claiming to be such officer is, by the judgment of a court of the State, either in appellate proceedings, or upon a mandamus or *quo warranto*, denied any right secured to him by the Constitution of the United States, he can obtain relief by a writ of error from this court." So that the *Sawyer* case directly supports the proposition that the judg-

ment of the highest court of a State depriving one of a state office may be reëxamined here, if the incumbent has specially claimed that he has been deprived of it without due process of law. That the point adjudged in *Sawyer's* case was as I have stated is seen from the opinion in *White* v. *Berry*, 171 U. S. 199, in which it was said: " But the court in its opinion in that case observed that under the Constitution and laws of the United States the distinction between law and equity, as existing in England at the time of the separation of the two countries, had been maintained although both jurisdictions were in the same courts, and held that a court of equity had no jurisdiction over the appointment and removal of public officers, and that to sustain a bill in equity to restrain or relieve against proceedings for the removal of public officers would invade the domain of the courts of common law, or of the executive and administrative departments of the Government."

Notwithstanding the above adjudications, the decision to-day is that this court has no jurisdiction, under any circumstances, to inquire whether a citizen has been deprived, without due process of law, of an office held by him under the constitution and laws of his State. If the contest between the one holding the office and the person seeking to hold it is determinable by the Legislature in a prescribed mode, this court, it appears, cannot inquire whether that mode was pursued nor interfere for the protection of the incumbent, even where the final action of the Legislature was confessedly capricious and arbitrary, inconsistent with the fundamental doctrines upon which our Government is based and the recognized principles that belong to due process of law, and not resting, in any degree, on evidence. If the Kentucky Legislature had wholly disregarded the mode prescribed by the statutes of that Commonwealth, and without appointing a Board of Contest composed of its own members, had, by joint resolution simply—without any evidence whatever or without notice to Taylor and without giving him an opportunity to be heard—declared Goebel to be Governor, this court, as we are informed by the decision just rendered, would be without jurisdiction to protect the incum-

MR. JUSTICE HARLAN, dissenting.

bent, for the reason, as is now adjudged, that the office in dispute is not "property" within the meaning of the Fourteenth Amendment. So that while we may inquire whether a citizen's land, worth a hundred dollars, or his mules, have been taken from him by the legislative or judicial authorities of his State without due process of law, we may not inquire whether the legislative or judicial authorities of a State have, without due process of law, ousted one lawfully elected and holding the office of Governor for a fixed term, with a salary payable at stated times, and put into his place one whom the people had said should not exercise the authority appertaining to that high position. It was long ago adjudged by the Court of Appeals of Kentucky that an office was "a valuable right and interest." *Page* v. *Hardin*, 8 B. Mon. 672. In *Commonwealth* v. *Jones*, 10 Bush, 735, the same court, referring to the provision in the constitution of Kentucky depriving any person who fought a duel of the right to hold an office, said : "It, in effect, dispossesses him of a right which the Supreme Court of the United States terms inalienable (4 Wall. 321), takes from him rights, privileges and immunities to which he was theretofore entitled, and strips him of one of the most valuable attributes of citizenship. The word 'deprived' is used in this section in the same sense in which it is used in section 12 of the Bill of Rights and in the Fifth Article of Amendment to the Federal Constitution."

When the Fourteenth Amendment forbade any State from depriving any person of life, liberty or property without due process of law, I had supposed that the intention of the People of the United States was to prevent the deprivation of any legal right in violation of the fundamental guarantees inhering in due process of law. The prohibitions of that amendment, as we have often said, apply to all the instrumentalities of the State, to its legislative, executive and judicial authorities; and therefore it has become a settled doctrine in the constitutional jurisprudence of this country that "whoever by virtue of public position under a state government deprives another of property, life or liberty without due process of law, or denies or takes away the equal protection of the laws, violates the con-

stitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State.   This must be so, or, as we have often said, the constitutional prohibition has no meaning, and the State has clothed one of its agents with power to annul or evade it." *Ex parte Virginia*, 100 U. S. 339; *Chicago, Burlington &c. Railroad* v. *Chicago*, 166 U. S. 226; *Scott* v. *McNeal*, 154 U. S. 34. Alluding to a contention that the party—a railroad company— which invoked the Fourteenth Amendment for the protection of its property, had the benefit of due process of law in the proceedings against it, because it had due notice of those proceedings and was admitted to appear and make defence, this court has also said: " But a state may not, by any of its agencies, disregard the prohibitions of the Fourteenth Amendment. Its judicial authorities may keep within the letter of the statute prescribing forms of procedure in its courts and give the parties interested the fullest opportunity to be heard, and yet it might be that its final action would be inconsistent with that amendment.   In determining what is due process of law regard must be had to substance and not to form." *Chicago, Burlington &c. Railroad* v. *Chicago*, above cited.   Again, in another case : " Though the law itself be fair on its face and impartial in appearance, yet if it is applied and administered by public authority with an evil eye and unequal hand   .   .   .   it is still within the prohibition of the Constitution." *Yick Wo* v. *Hopkins*, 118 U. S. 373.   See also *Henderson* v. *Mayor*, 92 U. S. 259; *Chy Lung* v. *Freeman*, 92 U. S. 275; *Neal* v. *Delaware*, 103 U. S. 370; *Soon* v. *Crowley*, 113 U. S. 703.

It is said that the courts cannot, in any case, go behind the final action of the legislature to ascertain whether that which was done was consistent with rights claimed under the Federal Constitution.   If this be true then it is in the power of the state legislature to override the supreme law of the land.   As long ago as *Davidson* v. *United States*, 96 U. S. 97, 102, this court, speaking by Mr. Justice Miller, said: " Can a State make anything due process of law which, by its own legislation, it chooses to declare such?   To affirm this is to hold that the prohibition to the States is of no avail, or has no application

MR. JUSTICE HARLAN, dissenting.

where the invasion of private rights is effected under the forms of state legislation." More recently we have said: "The idea that any legislature, state or Federal, can conclusively determine for the people and for the courts that what it enacts in the form of law, or what it authorizes its agents to do, is consistent with the fundamental law, is in opposition to the theory of our institutions. The duty rests upon all courts, Federal and state, when their jurisdiction is properly invoked, to see to it that no right secured by the supreme law of the land is impaired or destroyed by legislation. The function and duty of the judiciary distinguishes the American system from all other systems of government. The perpetuity of our institutions and the liberty which is enjoyed under them depend, in no small degree, upon the power given the judiciary to declare null and void all legislation that is clearly repugnant to the supreme law of the land." *Smyth* v. *Ames,* 169 U. S. 466.

I had supposed that the principles announced in the cases above cited were firmly established in the jurisprudence of this court, and that, if applied, they would serve to protect every right that could be brought within judicial cognizance against deprivation in violation of due process of law.

It seems however—if I do not misapprehend the scope of the decision now rendered—that under our system of government the right of a person to exercise a state office to which he has been lawfully chosen by popular vote may, so far as the Constitution of the United States is concerned, be taken from him by the arbitrary action of a state legislature, in utter disregard of the principle that Anglo-Saxon freemen have for centuries deemed to be essential in the requirement of due process of law—a principle reaffirmed in the Kentucky Bill of Rights, which declares that "absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a Republic, not even in the largest majority." § 2. I cannot assent to the interpretation now given to the Fourteenth Amendment.

Let us look at the question from another standpoint. The requirement of due process of law is applicable to the United States as well as to the States; for the Fifth Amendment—which all agree is a limitation on the authority of Federal agen-

cies—declares that "no person shall . . . be deprived of life, liberty or property without due process of law." If Congress by some enactment should attempt in violation of due process of law, to deprive one of an office held by him under the United States, will not the decision this day rendered compel this court to declare that such office is not property within the meaning of the Fifth Amendment, and therefore the incumbent would be without remedy unless he could invoke the protection of some other clause of the Constitution than the one in the Amendment relating to due process of law? Or, would the court hold that while a Federal office is property within the meaning of the clause in the Fifth Amendment declaring that "no person shall . . . be deprived of life, liberty or property without due process of law," a state office is not property within the meaning of the clause in the Fourteenth Amendment declaring, "nor shall any State deprive any person of life, liberty or property without due process of law?" Can it be that Congress may not deprive one of a Federal office without due process of law, but that a State may deprive one of a state office without due process of law?

I stand by the former rulings of this court in the cases above cited. I am of opinion that, equally with tangible property that may be bought and sold in the market, an office—certainly one established by the constitution of a State, to which office a salary is attached, and which cannot be abolished at the will of the legislature—is, in the highest sense, property of which the incumbent cannot be deprived arbitrarily in disregard of due process of law; that is, as this court said in *Kennard* v. *Louisiana,* in disregard of the "rules and forms which have been established for the protection of private rights." Apart from every other consideration, the right to receive and enjoy the salary attached to such an office is a right of property. And a right of property should be deemed property, unless we mean to play with words, and regard form rather than substance.

I go farther. The liberty of which the Fourteenth Amendment forbids a State from depriving any one without due process of law is something more than freedom from the enslavement of the body or from physical restraint. In my judgment the

MR. JUSTICE HARLAN, dissenting.

words "life, liberty or property" in the Fourteenth Amendment should be interpreted as embracing every right that may be brought within judicial cognizance, and therefore no right of that kind can be taken in violation of "due process of law."

In *Allgeyer* v. *Louisiana*, 165 U. S. 578, 589, this court unanimously held that the liberty mentioned in the Fourteenth Amendment "means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned."

Judge Cooley, speaking for the Supreme Court of Michigan in *People* v. *Hurlburt*, 24 Mich. 44, after observing that some things were too plain to be written, said: "Mr. Justice Story has well shown that constitutional freedom means something more than liberty permitted; it consists in the civil and political rights which are absolutely guaranteed, assured and guarded; in one's liberties as a man and a citizen—his right to vote, *his right to hold office*, his right to worship God according to the dictates of his conscience, his equality with all others who are his fellow citizens; all these guarded and protected and not held at the mercy and discretion of any one man or any popular majority. Story, Miscellaneous Writings, 620. If these are not now the absolute rights of the people of Michigan, they may be allowed more liberty of action and more privileges, but they are little nearer to constitutional freedom than Europe was when an imperial city sent out consuls to govern it."

The doctrine that liberty means something more than freedom from physical restraint is well illustrated in *Minor* v. *Happersett*, 21 Wall. 162, in which it was said that although the right of suffrage comes from the State, yet when granted it will be protected, and he "who has it can only be deprived of it by due process of law."

What more directly involves the liberty of the citizen than

to be able to enter upon the discharge of the duties of an office to which he has been lawfully elected by his fellow citizens? What more certainly infringes upon his liberty than for the Legislature of the State, by merely arbitrary action, in violation of the rules and forms required by due process of law, to take from him the right to discharge the public duties imposed upon him by his fellow citizens in accordance with law? Can it be that the right to pursue a lawful calling is a part of one's liberty secured by the Fourteenth Amendment against illegal deprivation; and yet the right to exercise an office to which one has been elected and into which he has been lawfully inducted is no part of the incumbent's liberty, and may be disregarded by the mere edict of a legislative body, sitting under a constitution which declares that absolute, arbitrary power exists nowhere in a republic? Can it be that the right to vote, once given, cannot under the Fourteenth Amendment be taken away except by due process of law — and it was so decided in *Minor* v. *Happersett*, above cited — and yet that the right of the person voted for to hold and exercise the functions of the office to which he was elected can, without violating that Amendment, be taken away without due process of law? Does the liberty of an American embrace his right to vote without discrimination against him on account of race, color or previous condition of servitude, and yet not embrace his right to serve in a position of public trust to which he has been lawfully called by his fellow citizens who voted for him? The liberty of which I am speaking is that which exists, and which can exist, only under a republican form of government. "The United States," the supreme law of the land declares, "shall guarantee to every State in the Union a republican form of government." And "the distinguishing feature of that form," this court has said, "is the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative powers reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves." *Duncan* v. *McFall*, 139 U. S. 461. But of what value is that right if the person selected by the people at the polls for an office provided for by the constitution, and holding a certificate

MR. JUSTICE HARLAN, dissenting.

of election, may be deprived of that office by the arbitrary action of the Legislature proceeding altogether without evidence?

I grant that it is competent for a State to provide for the determination of contested election cases by the Legislature. All that I now seek to maintain is the proposition that when a state legislature deals with a matter within its jurisdiction, and which involves the life, liberty or property of the citizen, it cannot ignore the requirement of due process of law. What due process of law may require in particular cases may not be applicable in other cases. The essential principle is that the State shall not by any of its agencies destroy or impair any right appertaining to life, liberty or property in violation of the principles upon which the requirement of due process of law rests. That requirement is " a restraint on the legislative as well as on the executive and judicial powers of the government." *Murray* v. *Land & Imp. Co.*, 18 How. 272, 276 ; *Scott* v. *McNeal*, above cited; *Chicago, Burlington &c. Railroad* v. *Chicago*, above cited. "That government can scarcely be deemed free," this court has said, " where the rights of property are left solely dependent upon the will of a legislative body without restraint." *Wilkinson* v. *Leland*, 2 Pet. 627.

It is to be regretted that it should be deemed necessary in a case like this to depart from the principles heretofore announced and acted upon by this court.

Looking into the record before us, I find such action taken by the body claiming to be organized as the lawful Legislature of Kentucky as was discreditable in the last degree and unworthy of the free people whom it professed to represent. The statute required the Board of Contest to give " true judgment" on the case, " according to the evidence." And when the statute further declared that the decision of the Board should be reported to the two Houses " for the future action of the General Assembly," that such decision should not be " final and conclusive," and that the General Assembly should determine the contest, it meant, of course, that such determination should rest upon the issues made by the parties and upon the evidence adduced before the Board of Contest. If the evidence had been before the Legislature it would have been physically im-

possible to have examined it; for, as we have seen, its final action was taken immediately after the Board of Contest had reported its decision. But, as heretofore stated, the evidence, before the Board was not transmitted to the Legislature, nor were the grounds upon which the Board proceeded disclosed. Yet the body which assumed to determine who had been elected Governor, without having before it one particle of the proof taken upon the issues made by the notice of contest, "adjudged" that Goebel had been legally elected Governor of Kentucky. No such farce under the guise of formal proceedings was ever enacted in the presence of a free people who take pride in the fact that our American Governments are governments of laws and not of men. That which was done was not equivalent to a decision or judgment or determination by the Legislature of a matter committed to it by law. It should be regarded merely as an exercise of arbitrary power by a given number of men who defied the law. It is not a pleasant thing to say—but after a thorough examination of the record a sense of duty constrains me to say—that the declaration by that body of men that Goebel was legally elected ought not to be respected in any court as a determination of the question in issue, but should be regarded only as action taken outside of law, in utter contempt of the constitutional rights of freemen to select their rulers. They had no *jurisdiction* to *determine* the contest for Governor *except upon the evidence introduced before the Board of Contest*, and in the absence of such evidence they were without authority to declare anything except that Taylor's right to the office of Governor, based upon the certificate awarded him, had not been impaired. Their determination of the contest without having the evidence before them, could have no greater effect in law than if the issue had been determined simply by a joint resolution, without taking proof or without notifying or hearing the parties interested.

It is to be also said that a fair interpretation of the record leads irresistibly to the conclusion that the body of men referred to were wholly indifferent as to the nature of the evidence adduced before the Board of Contest, and that there was a fixed purpose on their part, whatever the facts might be, to

put Goebel into office and to oust Taylor. Under the evidence in the case no result favorable to Goebel could have been reached on any ground upon which the Board of Contest or the Legislature had jurisdiction to act. The Constitution of Kentucky, as we have seen, declares that "the person *having* the highest number of votes shall be Governor." And the statute provides that the person returned having *received* the highest number of legal votes given "shall be adjudged to be the person elected and entitled to the office." With the constitution and the statutes of the State before him when preparing his notice to Taylor of contest, Goebel it is true did claim in very general terms that he was legally and rightfully elected; but he took care not to say—there is reason to believe that he purposely avoided saying—that he had *received* the highest number of legal votes cast for Governor. The evidence renders it clear that the declaration that he had received the highest number of legal votes cast was in total disregard of the facts—a declaration as extravagant as one adjudging that white was black, or that black was white. But such a declaration made by the body to which the Board of Contest reported should not surprise any one when it is remembered that it came from those who did not have before them any of the proofs taken in the case and were willing to act without proof. Those who composed that body seemed to have shut their eyes against the proof for fear that it would compel them to respect the popular will as expressed at the polls. Indignant, as naturally they were and should have been, at the assassination of their leader, they proceeded in defiance of all the forms of law, and in contempt of the principles upon which free governments rest, to avenge that terrible crime by committing another crime, namely, the destruction by arbitrary methods, of the right of the people to choose their Chief Magistrate. The former crime, if the offender be discovered, can be punished as directed by law. The latter should not be rewarded by a declaration of the inability of the judiciary to protect public and private rights, and thereby the rights of voters, against the wilful, arbitrary action of a legislative tribunal which, we must assume from the record, deliberately acted upon a contested election case involving the rights

of the people and of their chosen representative in the office of Governor without looking into the evidence upon which alone any lawful determination of the case could be made.    The assassination of an individual demands the severest punishment which it is competent for human laws in a free land to prescribe. But the overturning of the public will, as expressed at the ballot box, without evidence or against evidence, in order to accomplish partisan ends, is a crime against free government, and deserves the execration of all lovers of liberty.    Judge Burnam, speaking for himself and Judge Guffy in the Court of Appeals of Kentucky, although compelled, in his view of the law, to hold the action of the Legislature to be conclusive, said : "It is hard to imagine a more flagrant and partisan disregard of the modes of procedure which should govern a judicial tribunal in the determination of a great and important issue than is made manifest by the facts alleged and relied on by the contestees, and admitted by the demurrer filed in the action to be true, and I am firmly convinced, both from these admitted facts and from knowledge of the current history of these transactions, that the General Assembly, in the heat of anger, engendered by the intense partisan excitement which was at the time prevailing, have done two faithful, conscientious and able public servants an irreparable injury in depriving them of the offices to which they were elected by the people of this Commonwealth, and a still greater wrong has been done a large majority of the electors of this Commonwealth, who voted under difficult circumstances to elect these gentlemen to act as their servants in the discharge of the duties of these great offices."    I cannot believe that the judiciary is helpless in the presence of such a crime.    The person elected, as well as the people who elected him, have rights that the courts may protect.    To say that in such an emergency the judiciary cannot interfere is to subordinate right to mere power, and to recognize the Legislature of a State as above the supreme law of the land.    The constitution of Kentucky expressly forbids the exercise of absolute and arbitrary power over the lives, liberty or property of freemen.    And that principle is at the very foundation of the Government of the Union.    Indeed, to sustain that principle our

fathers waged the war for independence and established the Constitution of the United States. Yet by the decision this day rendered, no redress can be had in the courts when a legislative body, or one recognized as such by the courts, without due process of law, by the exercise of absolute, arbitrary power, and without evidence, takes an office having a fixed salary attached thereto from one who has been lawfully elected to such office by the voters of the State at a regular election. The doctrine of legislative absolutism is foreign to free government as it exists in this country. The cornerstone of our republican institutions is the principle that the powers of government shall, in all vital particulars, be distributed among three separate coordinate departments, legislative, executive and judicial. And liberty regulated by law cannot be permanently secured against the assaults of power or the tyranny of a majority, if the judiciary must be silent when rights existing independently of human sanction, or acquired under the law, are at the mercy of legislative action taken in violation of due process of law.

Other grounds are disclosed by the record which support the general proposition that the declaration by the body referred to that Goebel received the highest number of legal votes cast and was entitled to the office of Governor ought not to be regarded as valid, much less conclusive, upon the courts. But as those grounds have not been discussed by this court, and as it declines to determine the case upon the merits as disclosed by the evidence, I will not extend this opinion by commenting on them.

What has been said in this opinion as to the contest for Governor applies to the contest for Lieutenant Governor.

I am of opinion that the writ of error should not have been dismissed, and that the court should have adjudged that the decree below took from Taylor and Marshall rights protected by the Fourteenth Amendment of the Constitution of the United States.